J. B. BEARD, Plaintiff,

v.

Elvis J. STAHR, Jr., Secretary of the Army,

Stephen Ailes, Under Secretary of the Army,

and

Major General Joe C. Lambert, The Adjutant General, United States Army, Defendants.

Civ. A. No. 3528-61.

United States District Court District of Columbia.

Dec. 15, 1961.

Frederick Bernays Wiener, Washington, D. C., for plaintiff.

David C. Acheson, U. S. Atty., Joseph M. Hannon and Harold D. Rhynedance, Jr., Asst. U. S. Attys., Washington, D. C., for defendants.

Before BASTIAN, Circuit Judge, and PINE and HOLTZOFF, District Judges.

HOLTZOFF, District Judge.

This is an action brought by an officer of the regular Army against the Secretary of the Army, the Under Secretary and the Adjutant General, to enjoin them from removing him from the active list pursuant to elimination proceedings conducted under 10 U.S.C. § 3781 et seq., which established a procedure for dismissing officers of the regular Army on certain specified grounds. It is contended in behalf of the plaintiff that the statute is unconstitutional, and accordingly this three-judge court was convened. The attack on the statute is based on the claim that it is violative of due process of law under the Fifth Amendment in that it places the burden of proof on the officer to show cause for his retention on the active list; and in that it fails to require that he be confronted with witnesses against him. The matter is now before the Court on the plaintiff's motion for a preliminary injunction, and on cross-motions for summary judgment. We hold that the statute is valid.

The statute, 10 U.S.C. § 3781 to § 3797, became law on August 10, 1956, 70A Stat. 218, and was amended and expanded by

the Act of July 12, 1960, 74 Stat. 386. In brief, it authorizes the Secretary of the Army to convene a board of officers at any time to review the record of any commissioned officer on the active list of the regular Army, in order to determine whether he should be required to show cause for his retention on the active list because his performance of duty had fallen below the standards prescribed by the Secretary, or because of moral or professional dereliction, or because his retention would not be clearly consistent with the interests of national defense. It is provided further that Boards of Inquiry, composed of three or more officers, shall be convened to receive evidence and make findings and recommendations whether such an officer should be retained on the active list of the regular Army. The statute expressly requires the board to give the officer a fair and impartial hearing. If the Board of Inquiry determines that the officer has failed to establish that he should be retained on the active list, it is required to send the record of its proceedings to a Board of Review. The Secretary of the Army is authorized to convene Boards of Review, each composed of three or more officers, to review the records of officers recommended by Boards of Inquiry for removal from active service. If such a Board determines that the officer has failed to establish that he should be retained on the active list, it transmits its recommendation to the Secretary, who in that event is authorized to remove the officer from active service. The Secretary's action is final and conclusive. Admittedly this statute has been construed as placing upon the officer the burden of proving that he should be retained in the service.

It must be emphasized that the statute is not intended to provide a judicial trial or even a quasi-judicial hearing on specific charges. It merely prescribes an administrative routine for the elimination of officers who are deemed unsuitable.

The present proceeding arose out of the following facts. The plaintiff, J. B. Beard, is a Lieutenant Colonel in the United States Army, in which he has served for about nineteen years, having been inducted as a private and then worked his way up through the ranks. He has had an excellent record, and during World War II he received a Bronze Star Medal for gallantry in action. He is married and lives with his wife and five children. During the pertinent period he was stationed at Fort Monroe, Virginia.

This case had its origin in an episode that took place on September 21, 1960. That morning the plaintiff arrived in Washington, for a two-day official conference at the Pentagon. After the first day's session he took a walk about the city during the early evening. As he was passing the YMCA, he entered the building and went downstairs to the men's room. When he returned to the lobby and was about to leave, a stranger stared at him and made a hardly perceptible nod in the direction of the stairs. The stranger then went down toward the men's room and the plaintiff turned around and followed him. According to the police officer involved in the matter, a conversation ensued between them. It began with an exchange of innocuous remarks and then in rather vulgar phraseology the stranger indicated to the plaintiff that he was looking for a partner for a homosexual act. The plaintiff made a reply that seemed to acquiesce in the stranger's suggestion and also touched the stranger's body through his clothing in an indecent manner. The stranger then identified himself as a police officer, exhibited his badge, and placed the plaintiff under arrest.[1]

---

1. The evidence shows that complaints had been received by the Metropolitan Police Department of Washington, D. C., that homosexuals were in the habit of frequenting the men's room at the YMCA and, accordingly, detectives were assigned to keep the place under surveillance. Their practice was to enter into conversation with a suspicious person in order to determine whether he would make a proposition to perform a homosexual act, or for the police officer to make such proposition to the suspect in order to ascertain what the suspect's reaction and reply would be. In this instance, apparently, the second course was followed.

The plaintiff was then taken to Police Headquarters, where he was questioned and at the request of his interrogators wrote on a typewriter his own version of the event. His summary of what took place does not substantially differ from the detective's account, except in its choice of words. In addition, the plaintiff stated that he was not a homosexual, and had no intention of engaging in an unnatural act; that he suspected the stranger of being homosexual and was curious to know how such a person acted and what he said, and for this reason engaged in the conversation. The plaintiff further asserted that he had been on the verge of terminating the encounter and leaving when the stranger took a stand between him and the door and identified himself as a police officer. In a later statement the plaintiff indicated that his curiosity originated in the fact that he had recently handled such cases administratively, although he had never seen any such persons. The plaintiff was not charged at Police Headquarters, but was turned over to the military authorities who questioned him further and then released him to return to duty.[2]

Subsequently, a Removal Selection Board appointed by the Secretary of the Army to review the records of commissioned officers determined that the plaintiff should be required to show cause for his retention on the active list. Accordingly, on July 3, 1961, a formal notice was issued to the plaintiff notifying him to that effect and enumerating the following reasons:

(a) an existence of homosexual tendencies;

(b) conduct unbecoming an officer.[3]

A Board of Inquiry, composed of two Major Generals and one Brigadier General, was then convened and met at Norfolk, Virginia on July 19 and 20, 1961, devoting two days to this matter. The transcript indicates that the proceedings were conducted patiently and thoroughly, and that full opportunity was accorded to the plaintiff, who was represented by military counsel, to present evidence not only concerning the specific facts involved in the case, but also regarding his military record and character. The evidence in behalf of the Army was presented by an official known as "Recorder". It was entirely documentary. As proof of the incident that took place at the YMCA in Washington, there was introduced a formal written statement contemporaneously prepared by the detective. Counsel for the plaintiff had requested that the latter be produced in person, in order that he might be subjected to cross-examination. Efforts to obtain his presence were made by the Board, but proved unavailing because the Metropolitan Police Department declined to pay his expenses to Norfolk, and the Board lacked subpoena power. At the hearing, the plaintiff's counsel stated that his client was most appreciative of the efforts made to secure the attendance of the police officer. Actually, since there were no substantial discrepancies between the two narratives, and as the crucial question was what were the plaintiff's intention and mental operations in engaging in the encounter with the police officer, the presence of the latter could hardly have thrown very much light on

---

**2.** It is not clear on what charge the plaintiff was actually arrested, since apparently no formal charge was placed against him. The arrest could not have been on a charge of soliciting an immoral act, because the solicitation originated from the officer. It may have been a charge of assault in that the plaintiff indecently touched the officer's body.

**3.** The self-evident importance of eliminating homosexuals from the armed forces is emphasized by Army Regulations AR 635–89, Paragraph 2, a:

"Homosexual personnel irrespective of sex will not be permitted to serve in the Army in any capacity, and prompt separation of homosexuals, as defined in these regulations, is mandatory. Homosexuals are unfit for military service because their presence impairs the morale and discipline of the Army, and Homosexuality is a manifestation of a severe personality defect which appreciably limits the ability of such individuals to function effectively in society."

this vital issue. The documentary evidence introduced by the Army further showed that on one occasion when stationed in the Pacific during the War, the plaintiff had been a passive victim of a momentary, unconsummated homosexual attempt on the part of another officer. This information was elicited from the plaintiff during exhaustive interviews with him after the incident in Washington.

An Army psychiatrist, who had examined the plaintiff in behalf of the Army, was called as a witness by the plaintiff. He expressed the view that the plaintiff was not a homosexual and recommended that the plaintiff be retained in the Army, but also suggested that the plaintiff receive psychiatric out-patient treatment, preferably in a civilian facility. The plaintiff testified at length in his own behalf and was searchingly cross-examined. He maintained throughout that he had no intention to engage in any homosexual practice, but that he had participated in the conversation with the detective, thinking that the latter was a homosexual, merely to satisfy his curiosity as to how such persons reacted. He admitted that his conduct had been very foolish. Witnesses were called and documentary evidence submitted showing the high quality of the plaintiff's military record, and attesting to his good character and reputation.

The Board of Inquiry then made the following findings and recommendations:

"1. As to the allegation of existence of homosexual tendencies, that cause for retention has not been shown. This finding is based on the following reason:

The evidence presented by the respondent has not refuted nor rebutted the homosexual tendencies exhibited by the actions which took place in the YMCA, Washington, D. C., on the night of 21 September 1960.

"2. As to the allegation of conduct unbecoming an officer, that cause for retention has not been shown. This finding is based on the following reason:

The actions of the respondent in permitting himself to be lured by a complete stranger into a latrine, and in that latrine acting in such a manner as to cause his arrest, are completely incompatible with the conduct expected of an officer.

"In view of such findings, the Board recommends:

"Elimination, and that a General Discharge, under Honorable Conditions, be issued."

This action came before a Board of Review, composed of a Major General and two Brigadier Generals, on October 24, 1961. Such a Board proceeds *ex parte* solely on the record before the Board of Inquiry, and neither the respondent nor his counsel appear or is heard. It made the following findings and recommendations:

"The Army Board of Review for Eliminations, having reviewed the records of this case, in closed session and by secret written ballot, the majority of the members of the Board concurring, finds:

That Lt. Col. J. B. Beard, 084450, AGC has failed to show cause why he should be retained in the Army.

RECOMMENDATION

"The Army Board of Review for Eliminations, in closed session and by secret written ballot, the majority of the members of the Board concurring, recommends that Lt. Col. J. B. Beard, 084450, AGC,

a. Be eliminated from the Army.

b. Be issued a General Discharge."

The matter was then transmitted to the Secretary of the Army for final action, and this suit followed. A temporary restraining order was issued enjoining the Secretary for the time being from separating the plaintiff from the service, and this order was continued until the determination of the pending motions by this Court.

We now reach a consideration of the sole issue to be determined by this Court, namely, the constitutionality of the statute under which the action of the Army separating the plaintiff from the active list, is being taken. This discussion must be based on two provisions of the Constitution.

Article II, Section 2, provides that:

"The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; * * *."

█ Article I, Section 8, which contains an enumeration of the powers of Congress, in Clause 14, provides that the Congress shall have power

"To make Rules for the Government and Regulation of the land and naval Forces;"

An historical review of the usages of the executive and legislative branches of the Government in connection with the dismissal of Army and Naval officers, will show a continual practice and an unvarying understanding on the part of the President and the Congress, that the two provisions of the Constitution comprize plenary discretionary power, not limited by any other clause of the Constitution, to dismiss officers from active service in the armed forces at will at any time. While continuous legislative and executive construction is not conclusive, nevertheless, it is entitled to great weight in interpreting the Constitution, especially if the practice is uninterrupted and has been acquiesced in for a long period beginning with the adoption of the fundamental instrument. Springer v. United States, 102 U.S. 586, 599, 26 L.Ed. 253; The Laura, 114 U.S. 411, 5 S.Ct. 881, 29 L.Ed. 147; Field v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 36 L.Ed. 294; Fairbank v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862. It seems useful and desirable, therefore, to make a brief chronological survey of the continuous practice in this field.

From the early days of the Republic until the Civil War, the President exercised the power to dismiss officers entirely in his discretion. It was deemed a part of his constitutional authority as Commander in Chief.

Winthrop in his classic treatise on Military Law, Vol. 1, 1056, 1057, discusses this question in the following manner:

"The summary dismissal or discharge of officers of the army and navy has been, from the earliest period, a prerogative of the British sovereign * * * In this country, the power, having been employed by Congress antecedently to the adoption of the Constitution, was subsequently exercised by its successor in the executive department of the government, the President, from the period of the debate of 1789 on the subject, in the House of Representatives, down to the passage of the Act of 1866, * * *.

*       *       *       *       *       *

"Prior to the late war, indeed, summary dismissals or discharges of officers of the army by the order of the President, though from time to time resorted to, were not frequent. But during the war—especially between July 1861 and October 1865—these dismissals and discharges were numerous; about one hundred and fifty, of officers of all grades, and for various causes, being published in the General Orders, and upwards of fifteen hundred in the Special Orders, of the War Department. In the great majority of cases, no trial or investigation by a military court had preceded the action taken."

Again, Winthrop states (p. 1066):—

"It will appear from this review that the construction of the Constitution in favor of the executive power of removal, however doubtfully arrived at in the beginning, had, prior to the legislation of 1886, (incorporated in Art. 99) become firmly es-

tablished by the acceptation and judgment of the legal authorities and the continued and unquestioned practice of the executive department."

In 1806 the Congress expressly recognized the power of the President to dismiss an officer in Article 11 of the Articles of War enacted on April 10, 1806, 2 Stat. 359, which contained the following clause:

"nor shall a commissioned officer be discharged [from] the service, but by order of the President of the United States, or by sentence of a general court martial."

During the Civil War, by the Act of July 17, 1862, 12 Stat. 596, it was provided in Section 17—

"That the President of the United States be, and hereby is, authorized and requested to dismiss and discharge from the military service either in the army, navy, marine corps, or volunteer force, in the United States service, any officer for any cause which, in his judgment, either renders such officer unsuitable for, or whose dismission would promote, the public service."

The use of the word "request" may have some significance, as it is subject to the inference that the Congress considered that the President had inherent power in the matter, and was requesting him to exercise it under certain circumstances. After the hostilities ceased, this provision was repealed by the Act of July 13, 1866, Section 5, 14 Stat. 92, and the following was substituted:

"no officer in the military service or naval service shall in time of peace, be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof."

Article 99 of the Articles of War, contained in the Revised Statutes of 1878, Section 1342, p. 239, reenacted in substance the above mentioned clause

from Article 11 of the 1806 edition, and provided that

" * * * no officer shall be discharged or dismissed from the service, except by order of the President, or by sentence of a general court-martial."

It added the clause introduced in the Act of 1866 that

" * * * in time of peace no officer shall be dismissed, except in pursuance of a sentence of court-martial, or in mitigation thereof."

The Act of October 1, 1890, Section 3, 26 Stat. 562, authorized the President to prescribe a system of examinations for all officers of the Army below the rank of major in order to determine their fitness for promotion. It further provided that any officer who failed in two successive examinations should be discharged.

Article 118 of the Articles of War of 1916, Act of August 29, 1916, 39 Stat. 650, 669, reenacted the former Article 99, to the effect that no officer should be discharged from the service except by order of the President or by sentence of a General Court-Martial; and in time of peace, except in pursuance of a sentence of a court-martial or in mitigation thereof.

The Army Reorganization Act of June 4, 1920, Section 24(b), 41 Stat. 773, established an administrative procedure for eliminating officers from the Army. Such officers were classified in what was denominated as Class B. Before being placed in Class B, an officer was given an opportunity to appear before a court of inquiry. Its recommendations were forwarded to a Classification Board, which took final action that was not subject to further review, except upon the order of the President. An officer placed in Class B was either discharged or placed on the retired list, depending upon whether his unfitness was due to his own neglect, misconduct, or avoidable habits.

By the Act of June 29, 1948, Title I, Section 101, 62 Stat. 1081, the Secre-

tary of the Army and the Secretary of the Air Force were directed to convene Selection Boards to review the records of all officers on the active list of the regular Army, or the regular Air Force, to determine which of them should be required to show cause why they should be retained. Such selection was to be based upon the officers' failure to achieve such standards of performance as the Secretary might prescribe. Every officer so named was to receive a hearing before a Board of Inquiry. An unfavorable recommendation of such a Board was to be submitted for consideration to a Board of Review. If the latter recommended dismissal, the matter was to be transmitted to the Secretary, whose action was to be final and conclusive.

The Uniform Code of Military Justice, which became law on May 5, 1950, 64 Stat. 146, reenacted Article 118 of the Articles of War, 50 U.S.C. § 739, (now 10 U.S.C. § 1161).

On August 10, 1956, the statute invoked in this case became law, 10 U.S.C. § 3781 et seq. 70A Stat. 218. It was amended and expanded on July 12, 1960, 74 Stat. 386, and has been previously summarized.

The conclusion is inescapable that it was the continuous, uninterrupted, accepted understanding and practice from the adoption of the Constitution that an officer of the armed forces was subject to removal at any time by the President in his discretion, except as such discretion was limited by an Act of Congress; and further, that Congress might establish a procedure for the elimination of officers, who either are surplus, or not regarded as meeting the high standards that should be exacted from officers. Such a procedure is not subject to the limitations of the due process clause, or any other Constitutional provision.

Obviously, it is indispensable that the morale and efficiency of the armed forces be maintained at all times on the highest possible level, and that in order to attain this aim an excellent quality of performance, character and conduct must be exacted from officers. The safety of the nation may depend upon the nature of its armed forces and the leadership of their officers. High standards among the personnel of the armed forces are indispensable in the interests of national defense. They cannot be secured by the courts. Insofar as possible the Commander in Chief and the officers acting under him, must be left untrammelled and unfettered to keep the armed forces on a high level at all times.

██ Armies cannot be maintained and commanded, and wars cannot be won by the judicial process. Supervision and control over the selection, appointment and dismissal of officers are not judicial functions. Dismissals of officers are not limited or controlled by the Bill of Rights.

The decisions of the Supreme Court have throughout our history recognized the inherent power to dismiss officers of the armed forces and have sustained statutory provisions creating an administrative routine to attain this result. No case has been cited holding any such statute repugnant to the Constitution and independent research has disclosed none.

Thus, in McElrath v. United States, 102 U.S. 426, 437, 26 L.Ed. 189, the Supreme Court, in an opinion by Mr. Justice Harlan, held that under the Act of 1862, the President had the power to dismiss an officer from the service summarily.

In Blake v. United States, 103 U.S. 227, 231, 26 L.Ed. 462, in an opinion again rendered by Mr. Justice Harlan, it was stated:

"From the organization of the government, under the present Constitution, to the commencement of the recent war for the suppression of the rebellion, the power of the President, in an absence of statutory regulations, to dismiss from the service an officer of the army or navy, was not questioned in any adjudged case, or by any department of the government."

If unbridled and unlimited power to dismiss officers is inherent in the President unless limited by Acts of Congress, it follows *a fortiori* that such statutory restrictions and administrative procedure as may be imposed or created by Congress, are not subject to the limitations of the Bill of Rights or any other constitutional provisions.

In Reaves v. Ainsworth, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225, the Court sustained the Act of 1890 above mentioned, under which an army officer was to be discharged from the service if he failed to pass two successive examinations for promotion. The Court observed (p. 302, 31 S.Ct. p. 232) that in that case the examining board had refused to call witnesses as to the officer's physical condition on the ground that the physicians named had already filed certificates. The Court further noted that the Board did not even allow the officer to call witnesses, to inspect exhibits presented to the Board, or to cross-examine the surgeons as to their reports. The Supreme Court found no basis for criticizing this procedure. In summarizing its views the Court made the following penetrating observations (p. 306, 31 S.Ct. p. 234):

> "*The courts are not the only instrumentalities of government. They cannot command or regulate the Army.* To be promoted or to be retired may be the right of an officer, the value to him of his commission, but greater even than that is the welfare of the country, and, it may be, even its safety, through the efficiency of the Army. * * * If it had been the intention of Congress to give to an officer the right to raise issues and controversies with the board upon the elements, physical and mental, of his qualifications for promotion, and carry them over the head of the President to the courts, and there litigated, it may be, through a course of years, upon the assertion of error or injustice in the board's rulings or decisions, such intention would have been explicitly declared. The embarrassment of

such a right to the service, indeed, the detriment of it, may be imagined." (Emphasis supplied.)

In Wallace v. United States, 257 U.S. 541, 544, 42 S.Ct. 221, 222, 66 L.Ed. 360, Mr. Chief Justice Taft made the following comments:

> "Before the Civil War there was no restriction upon the President's power to remove an officer of the Army or Navy. The principle that the power of removal was incident to the power of appointment was early determined by the Senate to involve the conclusion that, at least in absence of restrictive legislation, the President, though he could not appoint without the consent of the Senate, could remove without such consent in the case of any officer whose tenure was not fixed by the Constitution."

In French v. Weeks, 259 U.S. 326, 327–328, 42 S.Ct. 505, 66 L.Ed. 965, the Supreme Court sustained the validity of the Act of June 4, 1920, which, as stated above, provided for a classification of all officers in Class A and Class B, the latter not to be retained in the service.

In Creary v. Weeks, 259 U.S. 336, 343, 42 S.Ct. 509, 510, 66 L.Ed. 973, decided on the same day, Mr. Justice Clarke wrote as follows:

> "The power given to Congress by the Constitution to raise and equip armies and to make regulations for the government of the land and naval forces of the country (Article 1, § 8) is as plenary and specific as that given for the organization and conduct of civil affairs; * * *. It is difficult to imagine any process of government more distinctively administrative in its nature and less adapted to be dealt with by the processes of civil courts than the classification and reduction in number of the officers of the army, * *. In its nature it belongs to the executive and not to the judicial branch of the government."

■ The specific objections advanced by the plaintiff against the validity of the present statute can be disposed of briefly. The first critcism is that it places the burden of proof on the officer instead of on the Government. Bearing in mind that the purpose of the statute is not to provide for trial of officers on specific charges, but to create an administrative machinery and routine for eliminating officers who do not meet the required standards, there is no constitutional objection to placing the burden of proof where it is deemed appropriate to do so in the interests of the public welfare. The essence of the statute is that if a doubt arises whether a particular officer should be retained in the service, he has the onus of convincing his superiors that he should not be eliminated. No constitutional objection to this provision is discernible.

The second objection is that there is no provision for confronting the officer with witnesses against him. The constitutional provision for confrontation is a vital feature of the Bill of Rights. It is intended, however, for trials in the criminal courts and is a safeguard in the administration of the criminal law. It does not necessarily have an essential function in other activities of Government. For example, the Civil Service Act, 5 U.S.C.A. § 652, provides that a civil service employee shall not be dismissed except on charges. It not only fails to provide for confrontation with witnesses, but it does not even accord a hearing to the employee. It requires merely that the employee be given notice of the charges and an opportunity to file a written reply. The validity of this provision is unquestioned and has been consistently applied and judicially approved since its enactment in 1912.[4]

In Williams v. Zuckert, decided by the United States Court of Appeals for the District of Columbia Circuit, on November 9, 1961, 296 F.2d 416, it was held that a civilian employee of the Government who has veterans' preference is not entitled to the production of witnesses for cross-examination, in a case in which affidavits were the basis of charges against him. The Court called attention to the fact that statutes authorizing the dismissal of civilian employees by an administrative process, do not require the Government to produce for cross-examination the persons whose affidavits or statements supply the factual basis for dismissal. No reason is perceived why these remarks are not equally applicable to the statute here under consideration. The necessary inference from the opinion in Williams v. Zuckert, is that there is no constitutional infirmity in the statute because of that circumstance.

The Court, therefore, concludes that the statute under consideration is not repugnant to the Constitution.

The cases on which the plaintiff relies are distinguishable. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, did not involve members of the armed forces, but concerned a civilian employee of a Government contractor. He was dismissed by the latter because the Government denied him clearance to security information, and the employer was unable to use him on work of other types. The case does not bear on the rights of the Government as against officers of the armed forces. Moreover, the effect of this case has been considerably narrowed by Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230, in which it was held that an employee of a concessionaire on a military or naval installation could be summarily deprived of right of access to the area.

Bland v. Connally, 110 U.S.App.D.C. 375, 293 F.2d 852, and Davis v. Stahr, 110 U.S.App.D.C. 383, 293 F.2d 860, likewise did not deal with active personnel of the armed forces, but concerned inactive reservists. The decisions were

---

4. Bailey v. Richardson, 86 U.S.App.D.C. 248, 256 et seq., 182 F.2d 46, affirmed by equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352.

based on the proposition that Congress had not authorized the Secretary of the Navy to issue a discharge to inactive reservists under conditions less than honorable. No constitutional question was determined.

Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503, held that neither statutes nor regulations authorized the Secretary of the Army to issue discharges to soldiers in form other than honorable because of pre-induction activities. It did not involve any constitutional question.

In conclusion the Court may well refer to the famous remarks made by Mr. Chief Justice Taney, over a century ago, in Decatur v. Paulding, 14 Pet. 497, 516, 10 L.Ed. 559:

> "The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given to them."

Accordingly, the motion of the defendants for summary judgment will be granted, and the plaintiff's cross-motion denied, the motion for a preliminary injunction will be denied, and the temporary restraining order vacated.[5] Counsel may submit an appropriate order.

---

5. In view of the conclusion being reached, it is unnecessary to discuss the procedural objection interposed by the Government, that the plaintiff's action was prematurely brought in that he failed to exhaust his administrative remedies. In this connection, see Ogden v. Zuckert, decided by the Court of Appeals, D.C. Circuit, December 14, 1961, 298 F.2d 312.