## OSBORN *v.* UNITED STATES.

No. 29. Argued October 12–13, 1966.—Decided December 12, 1966.

*Jacob Kossman* argued the cause and filed briefs for petitioner.

*Nathan Lewin* argued the cause for the United States. With him on the brief were *Solicitor General Marshall,*

*Assistant Attorney General Vinson, Beatrice Rosenberg* and *Kirby W. Patterson.*

*Herman Schwartz* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union, as *amicus curiae.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner, a Nashville lawyer, was convicted in the United States District Court for the Middle District of Tennessee upon one count of an indictment under 18 U. S. C. § 1503, which charged him with endeavoring to bribe a member of the jury panel in a prospective federal criminal trial.[1] The conviction was affirmed by the Court of Appeals, 350 F. 2d 497. We granted certiorari, 382 U. S. 1023, primarily to consider whether the

---

[1] 18 U. S. C. § 1503 provides as follows:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

conviction rests upon unconstitutionally acquired evidence, although the petitioner also presses other claims.

In late 1963, James R. Hoffa was awaiting trial upon a criminal charge in the federal court in Nashville, and the petitioner, as one of Hoffa's attorneys, was engaged in preparing for that trial. In connection with these preparations the petitioner hired a man named Robert Vick to make background investigations of the people listed on the panel from which members of the jury for the Hoffa trial were to be drawn. Vick was a member of the Nashville police department whom the petitioner had employed for similar investigative work in connection with another criminal trial of the same defendant a year earlier. What the petitioner did not know was that Vick, before applying for the job with the petitioner in 1963, had met several times with federal agents and had agreed to report to them any "illegal activities" he might observe.

The conviction which we now review was upon the charge that the petitioner "during the period from on or about November 6, 1963, up to and including November 15, 1963, . . . did unlawfully, knowingly, wilfully and corruptly endeavor to influence, obstruct and impede the due administration of justice . . ." in that he "did request, counsel and direct Robert D. Vick to contact Ralph A. Elliott, who was, and was known by the said Osborn to be, a member of the petit jury panel from which the petit jury to hear the [Hoffa] trial was scheduled to be drawn, and to offer and promise to pay the said Ralph A. Elliott $10,000 to induce the said Elliott to vote for an acquittal, if the said Elliott should be selected to sit on the petit jury in the said trial." [2]

---

[2] The indictment contained two other counts charging similar offenses with respect to the earlier trial of the same defendant. The Government dismissed one of these counts, and the petitioner was acquitted on the other.

The primary evidence against the petitioner on this charge consisted of Vick's testimony, a tape recording of a conversation between the petitioner and Vick, and admissions which the petitioner had made during the course of federal disbarment proceedings.

Vick testified that during a discussion with the petitioner at the latter's office on November 7, he mentioned that he knew some of the prospective jurors. At this, according to Vick, the petitioner "jumped up," and said, "You do? Why didn't you tell me?" The two then moved outside into the adjacent alley to continue the conversation. There, Vick testified, he told the petitioner that one of the prospective jurors, Ralph Elliott, was his cousin, and the petitioner told Vick to pay a visit to Elliott to see what arrangements could be made about the case. Vick also testified to meetings with the petitioner on November 8 and November 11, when he told the petitioner, falsely, that he had visited Elliott and found him "susceptible to money for hanging this jury," to which the petitioner responded by offering $5,000 to Elliott if he became a member of the jury and an additional $5,000 "when he hung the jury, but he would have to go all the way, and to assure Mr. Elliott that he would not be alone, that there would be some other jurors in there."

I.

No claim is made in this case that Vick's testimony about the petitioner's incriminating statements was inadmissible in evidence. Cf. *Hoffa* v. *United States, ante,* p. 293; *Lewis* v. *United States, ante,* p. 206. What is challenged is the introduction in evidence of a tape recording of one of the conversations about which Vick testified, specifically the conversation which took place in the petitioner's office on November 11. The recording of this conversation was played for the jury, and a written transcript of it was introduced in evidence. We

are asked to hold that the recording should have been excluded, either upon constitutional grounds, *Weeks* v. *United States,* 232 U. S. 383, or in the exercise of our supervisory power over the federal courts. *McNabb* v. *United States,* 318 U. S. 332.

There is no question of the accuracy of the recording. The petitioner testified that it was a "substantially correct" reproduction of what took place in his office on November 11. There can be no doubt, either, of the recording's probative relevance. It provided strong corroboration of the truth of the charge against the petitioner.[3] The recording was made by means of a device concealed upon Vick's person during the November 11 meeting. We thus deal here not with surreptitious surveillance of a private conversation by an outsider, cf. *Silverman* v. *United States,* 365 U. S. 505, but, as in *Lopez* v. *United States,* 373 U. S. 427, with the use by one party of a device to make an accurate record of a conversation about which that party later testified. Unless *Lopez* v. *United States* is to be disregarded, therefore, the petitioner cannot prevail.[4]

But we need not rest our decision here upon the broad foundation of the Court's opinion in *Lopez,* because it is evident that the circumstances under which the tape recording was obtained in this case fall within the narrower compass of the *Lopez* concurring and dissenting opinions. Accordingly, it is appropriate to set out with some precision what these circumstances were.

---

[3] A transcript of the recording is reproduced as an Appendix to this opinion.

[4] It is argued that in *Lopez* the petitioner knew that the person to whom he offered a bribe was a federal officer. But, even assuming there might otherwise be some force to this distinction, it is enough to point out that in the present case the petitioner also knew he was talking to a law enforcement officer—a member of the Nashville police department.

328

Immediately after his November 7 meeting with the petitioner, at which, according to Vick, the possibility of approaching the juror Elliott was first discussed, Vick reported the conversation to an agent of the United States Department of Justice. Vick was then requested to put his report in the form of a written statement under oath, which he did.[5] The following day this sworn statement was shown by government attorneys to the two judges of the Federal District Court, Chief Judge Miller and Judge Gray. After considering this affidavit, the judges agreed to authorize agents of the Federal Bureau of Investigation to conceal a recorder on Vick's person in order to determine from recordings of further

---

[5] The relevant portion of this affidavit was as follows:

"On November 7, 1963, I was in Mr. Osborn's office going over the results of my investigation. I was aware that the jury panel which I had been investigating was the panel assigned to Judge William E. Miller. Mr. Osborn and I got into a discussion of the jury panel assigned to Judge Frank Gray, Jr. This jury panel list had previously been shown to me by John Polk, an investigator for Mr. Osborn. Polk told me at that time that he was investigating the jury panel assigned to Judge Gray. At that time, I mentioned to Polk that I knew three of the people on the jury panel. In discussing the panel with Mr. Osborn, I again mentioned that I knew three of the people on the jury panel. Mr. Osborn said, 'You do? Why didn't you tell me?' I told Mr. Osborn I had told John Polk and assumed that John Polk had told him. Mr. Osborn said that Polk had not told him and suggested that we discuss the matter further. We then left Mr. Osborn's office and walked out onto the street to discuss the matter further. Mr. Osborn asked me how well I knew the three prospective jurors. I told him that I knew Mr. Ralph A. Elliott, Springfield, Tennessee, the best since he was my cousin. Mr. Osborn asked me whether I knew him well enough to talk to him about anything. I said that I thought I did. Mr. Osborn then said, 'Go contact him right away. Sit down and talk to him and get him on our side. We want him on the jury.' I told Mr. Osborn that I thought Mr. Elliott was not in very good financial position and Mr. Osborn said, 'Good, go see him right away.'"

conversations between Vick and the petitioner whether the statements in Vick's affidavit were true. It was this judicial authorization which ultimately led to the recording here in question.[6]

The issue here, therefore, is not the permissibility of "indiscriminate use of such devices in law enforcement,"[7] but the permissibility of using such a device under the most precise and discriminate circumstances, circumstances which fully met the "requirement of particularity" which the dissenting opinion in *Lopez* found necessary.[8]

The situation which faced the two judges of the District Court when they were presented with Vick's affidavit on November 8, and the motivations which prompted their authorization of the recorder are re-

[6] The recording device did not operate properly on the occasion of Vick's visit to the petitioner's office on November 8, and Vick made a written statement of what occurred during that meeting. The government lawyers reported these circumstances to District Judge Miller, who then authorized the use of the recorder on November 11, under the same conditions:

"I said on that second occasion the same as I did on the first occasion: that the tape recorder should be used under proper surveillance, supervision, to see that it was not faked in any way, and to take every precaution to determine that it was used in a fair manner, so that we could get at the bottom of it and determine what the truth was."

[7] "I also share the opinion of MR. JUSTICE BRENNAN that the fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; that indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments; and that these considerations impose a heavier responsibility on this Court in its supervision of the fairness of procedures in the federal court system. However, I do not believe that, as a result, all uses of such devices should be proscribed either as unconstitutional or as unfair law enforcement methods." *Lopez* v. *United States*, 373 U. S., at 441 (concurring opinion of THE CHIEF JUSTICE).

[8] 373 U. S., at 463.

flected in the words of Chief Judge Miller. As he put it, "The affidavit contained information which reflected seriously upon a member of the bar of this court, who had practiced in my court ever since I have been on the bench. I decided that some action had to be taken to determine whether this information was correct or whether it was false. It was the most serious problem that I have had to deal with since I have been on the bench. I could not sweep it under the rug."

So it was that, in response to a detailed factual affidavit alleging the commission of a specific criminal offense directly and immediately affecting the administration of justice in the federal court, the judges of that court jointly authorized the use of a recording device for the narrow and particularized purpose of ascertaining the truth of the affidavit's allegations. As the district judges recognized, it was imperative to determine whether the integrity of their court was being undermined, and highly undesirable that this determination should hinge on the inconclusive outcome of a testimonial contest between the only two people in the world who knew the truth—one an informer, the other a lawyer of previous good repute. There could hardly be a clearer example of " 'the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment' " as "a precondition of lawful electronic surveillance." [9]

---

[9] "The requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement. It is at least clear that 'the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment,' *Ohio ex rel. Eaton* v. *Price,* 364 U. S. 263, 272 (separate opinion); see *McDonald* v. *United States,* 335 U. S. 451, 455; *Abel* v. *United States,* 362 U. S. 217, 251–252 (dissenting opinion), could be made a precondition of lawful electronic surveillance. . . ." *Lopez* v. *United States,* 373 U. S., at 464 (dissenting opinion of MR. JUSTICE BRENNAN).

We hold on these facts that the use of the recording device was permissible, and consequently that the recording itself was properly admitted as evidence at the petitioner's trial.

## II.

The petitioner's defense was one of entrapment, and he renews here the contention made in his motion for acquittal at the trial that entrapment was established as a matter of law. We cannot agree.

The validity of the entrapment defense depended upon what had transpired at the meetings between the petitioner and Vick which took place before the recorded conversation of November 11. According to the petitioner, Vick initiated the idea of making a corrupt approach to Elliott on October 28, and the petitioner at first resisted the suggestion and tried to discourage Vick from carrying it out. The petitioner conceded that he ultimately acquiesced in the scheme, out of "weakness" and because he was exhausted from overwork, but said that he never seriously intended actually to carry out the plan to bribe Elliott. But Vick's version of what had happened was, as stated above, quite different, and the truth of the matter was for the jury to determine.[10] *Masciale* v. *United States,* 356 U. S. 386. Surely it was not a "trap for the unwary innocent," *Sherman* v. *United States,* 356 U. S. 369, 372, for Vick to tell the petitioner, truthfully, that he knew some of the members of the jury panel and that one of them was his cousin. And according to Vick he had said no more when the petitioner "jumped up," went out into the alley with him, and initiated the effort to get Elliott "on our side." At the most, Vick's statement afforded the petitioner "opportunities or facilities" for the commission of a criminal

---

[10] The petitioner's trial counsel explicitly conceded that the entrapment issue was for the jury to resolve.

offense, and that is a far cry from entrapment. *Sherman* v. *United States, supra,* at 372; *Sorrells* v. *United States,* 287 U. S. 435, 441.[11]

## III.

Finally, the argument is made that even if the admissibility and truth of all the evidence against the petitioner be accepted, this conviction must be set aside because his conduct did not constitute a violation of 18 U. S. C. § 1503.[12] The basis for this argument is that since Vick never in fact approached Elliott and never intended to do so, any endeavor on the petitioner's part was impossible of accomplishment.

---

[11] The petitioner further argues, with respect to the entrapment defense, that the jury instructions were erroneous in two respects, and that government rebuttal evidence was improperly received.

It is urged that the trial judge committed error in failing to instruct the jury that if they acquitted the petitioner under Count 2 (charging an endeavor to bribe a juror at the 1962 Hoffa trial), they must not consider any evidence under that count in determining the petitioner's guilt under Count 1. Such an instruction was not requested. Rule 30, Fed. Rules Crim. Proc. Moreover, it is settled that when the defense of entrapment is raised, evidence of prior conduct tending to show the defendant's predisposition to commit the offense charged is admissible. See *Sorrells* v. *United States,* 287 U. S. 435, 451.

The petitioner further argues that the instructions on entrapment erroneously left to the jury the question of whether the tape recording had been obtained by lawful means. We do not so understand the trial judge's language, and neither, apparently, did trial counsel, because no objection was made to the instructions as given. Rule 30, Fed. Rules Crim. Proc. Moreover, such an instruction would have been favorable to the petitioner, because the judge, in denying the earlier defense motion to suppress, had already ruled that the recording had been lawfully obtained.

Finally, objection is made to permitting the Government on rebuttal to introduce Vick's November 8 affidavit and show the circumstances under which the tape recording had been authorized by the judges. But this evidence was a relevant response to the petitioner's testimony that it was Vick who, at the instigation of the Government, had initiated the plan to approach Elliott as early as October 28.

[12] See n. 1, *supra.*

We reject the argument. Whatever continuing validity the doctrine of "impossibility," with all its subtleties, may continue to have in the law of criminal attempt,[13] that body of law is inapplicable here. The statute under which the petitioner was convicted makes an offense of any proscribed "endeavor." And almost 50 years ago this Court pointed out the significance of that word: "The word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to accomplish the evil purpose that the section was enacted to prevent. . . . The section . . . is not directed at success in corrupting a juror but at the 'endeavor' to do so. Experimental approaches to the corruption of a juror are the 'endeavor' of the section." *United States* v. *Russell,* 255 U. S. 138, 143.

If the evidence against the petitioner be accepted, there can be no question that he corruptly endeavored to impede the due administration of justice by instructing Robert Vick to offer a bribe to a prospective juror in a federal criminal case.

*Affirmed.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT.

Transcript of the recording of the Vick-Osborn conversation of November 11, 1963:

"Girl: You can go in now.

"Vick: O. K. honey. Hello, Mr. Osborn.

---

[13] Compare *People* v. *Jaffe,* 185 N. Y. 497, 78 N. E. 169, with *People* v. *Gardner,* 144 N. Y. 119, 38 N. E. 1003. See Wechsler, Jones & Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy, 61 Col. L. Rev. 571, 578–585 (1961).

334

"Osborn: Hello Bob, close the door, my friend, and let's see what's up.

"Vick: How're you doing?

"Osborn: No good. How're you doing?

"Vick: Oh, pretty good. You want to talk in here?

"Osborn: How far did you go?

"Vick: Well, pretty far.

"Osborn: Maybe we'd better . . .

"Vick: Whatever you say. Don't make any difference to me.

"Osborn: [Inaudible whisper.]

"Vick: I'm comfortable, but er, this chair sits good, but we'll take off if you want to, but

"Osborn: Did you talk to him?

"Vick: Huh?

"Osborn: Did you talk to him?

"Vick: Yeah. I went down to Springfield Saturday morning and talked to er.

"Osborn: Elliott?

"Vick: Elliott.

"Osborn: [Inaudible whisper.]

"Vick: Huh?

"Osborn: Is there any chance in the world that he would report you?

"Vick: That he will report me to the FBI? Why of course, there's always a chance, but I wouldn't got into it if I thought it was very, very great.

"Osborn: [Laughed.]

"Vick: You understand that.

"Osborn: [Laughing.] Yeah, I do know. Old Bob first.

"Vick: That's right. `Don't worry. I'm gonna take care of old Bob and I know, and of course I'm depending on you to take care of old Bob if anything, if anything goes wrong.

"Osborn: I am. I am. Why certainly.

"Vick: Er, we had coffee Saturday morning and now he had previously told you that it's the son.

"Osborn: It is?

"Vick: Yes, and not the father.

"Osborn: That's right.

"Vick: The son is Ralph Alden Elliott and the father is Ralph Donnal. Alden is er—Marie, that's Ralph's wife who killed herself. That was her maiden name, Alden, see? Anyway, we had coffee and he's been on a hung jury up here this week, see?

"Osborn: I know that.

"Vick: Well, I didn't know that but anyway, he brought that up so he got to talking about the last Hoffa case being hung, you know, and some guy refused $10,000 to hang it, see, and he said the guy was crazy, he should've took it, you know, and so we talked about and so just discreetly, you know, and course I'm really playing this thing slow, that's the reason I asked you if you wanted a lawyer down there to handle it or you wanted me to handle it, cause I'm gonna play it easy.

"Osborn: The less people, the better.

"Vick: That's right. Well, I'm gonna play it slow and easy myself and er, anyway, we talked about er, something about five thousand now and five thousand later, see, so he did, he brought up five thousand see, and talking about about [sic] how they pay it off you know and things like that. I don't know whether he suspected why I was there or not cause I don't just drop out of the blue to visit him socially, you know. We're friends, close kin, cousins, but I don't ordinarily just, we don't fraternize, you know, and er, so he seemed very receptive for er, to hang the thing for five now and five later. Now, er, I thought I would report back to you and see what you say.

"Osborn: That's fine! The thing to do is set it up for a point later so you won't be running back and forth.

"Vick: Yeah.

"Osborn: Then tell him it's a deal.

"Vick: It's what?

336

"Osborn: That it's a deal. What we'll have to do—when it gets down to the trial date, when we know the date, tomorrow for example if the Supreme Court rules against us, well within a week we'll know when the trial comes. Then he has to be certain that when he gets on, he's got to know that he'll just be talking to you and nobody else. ——

"Vick: Social strictly.

"Osborn: Oh yeah.

"Vick: I've got my story all fixed on that.

"Osborn: Then he will have to know where to, he will have to know where to come.

"Vick: Well, er . . .

"Osborn: And, he'll have to know when.

"Vick: Er, do you want to see him yourself? You want me to handle it or what?

"Osborn: Uh huh. You're gonna handle it yourself.

"Vick: All right. You want to know it when he's ready, when I think he's ready for the five thousand. Is that right?

"Osborn: Well no, when he gets on the panel, once he gets on the jury. Provided he gets on the panel.

"Vick: Yeah. Oh yeah. That's right. That's right. Well now, he's on the number one.

"Osborn: I know, but now . . .

"Vick: But you don't know that would be the one.

"Osborn: Well, I know this, that if we go to trial before that jury he'll be on it but suppose the government challenges him over being on another hung jury.

"Vick: Oh, I see.

"Osborn: Where are we then?

"Vick: Oh, I see. I see.

"Osborn: So we have to be certain that he makes it on the jury.

"Vick: Well now, here's one thing, Tommy. He's a member of the CWA, see, and the Teamsters, or

"Osborn: Well, they'll knock him off.

"Vick: Naw, they won't. They've had a fight with the CWA, see?

"Osborn: I think everything looks perfect.

"Vick: I think it's in our favor, see. I think that'll work to our favor.

"Osborn: That's why I'm so anxious that they accept him.

"Vick: I think they would, too. I don't think they would have a reason in the world to. I don't think that I'm under any surveillance or suspicion or anything like that.

"Osborn: I don't think so.

"Vick: I don't know. I don't frankly think, since last year and since I told them I was through with the thing, I don't think I have been. Now Fred,

"Osborn: I don't think you have either.

"Vick: You know Fred and I may not [pause], he may be too suspicious and I may not be suspicious enough. I don't know.

"Osborn: I think you've got it sized up exactly right.

"Vick: Well, I think so.

"Osborn: Now, you know you promised that fella that you would have nothing more to do with that case.

"Vick: That's right.

"Osborn: At that time you had already checked on some of the jury that went into Miller's court. You went ahead and did that.

"Vick: Well, here's another thing, Tommy.

"Osborn: —— church affiliations, background, occupation and that sort of thing on those that went into Miller's court. You didn't even touch them. You didn't even investigate the people that were in Judge Gray's court.

"Vick: Well, here's the thing about it, Tommy. Soon as this damn thing's over, they're gonna kick my . . .

out anyway, so probably Fred's too. So, I might as well get out of it what I can. The way I look at it. I might be wrong cause the Tennessean is not gonna have anything to do with anybody that's had anything to do with the case now or in the past, you know that. Cause they're too close to the Kennedy's.

"Osborn: All right, so we'll leave it to you. The only thing to do would be to tell him, in other words your next contact with him would be to tell him if he wants that deal, he's got it.

"Vick: O. K.

"Osborn: The only thing it depends upon is him being accepted on the jury. If the government challenges him there will be no deal.

"Vick: All right. If he is seated.

"Osborn: If he's seated.

"Vick: He can expect five thousand then and

"Osborn: Immediately.

"Vick: Immediately and then five thousand when it's hung. Is that right?

"Osborn: All the way, now!

"Vick: Oh, he's got to stay all the way?

"Osborn: All the way.

"Vick: No swing. You don't want him to swing like we discussed once before. You want him

"Osborn: Of course, he could be guided by his own b——, but that always leaves a question. The thing to do is just stick with his crowd. That way we'll look better and maybe they'll have to go to another trial if we get a pretty good count.

"Vick: Oh. Now, I'm going to play it just like you told me previously, to reassure him and keep him from getting panicky, you know. I have reason to believe that he won't be alone, you know.

"Osborn: You assure him of that. 100%.

"Vick: And to keep any fears down that he might have, see?

"Osborn: Tell him there will be at least two others with him.

"Vick: Now, another thing, I want to ask you does John know anything. You know, I originally told John about me knowing.

"Osborn: He does not know one thing.

"Vick: He doesn't know. O. K.

"Osborn: He'll come in and recommend this man —— and I'll say well just let it alone, you know.

"Vick: Yeah. So he doesn't know anything about this at all?

"Osborn: Nothing.

"Vick: Now he hasn't seen me. When I first came here he was in here, see.

"Osborn: —— We'll keep it secret. The way we keep it safe is that nobody knows about it but you and me —— where could they ever go?

"Vick: Well that's it, I reckon, or I'll probably go down there. See, I'm off tonight. I'm off Sunday and Monday, see. That's why I talked to you yesterday. I had a notion to go down there yesterday cause I was off last night and I'm off again tonight.

"Osborn: It will be a week at least until we know the trial date.

"Vick: O. K. You want to hold up doing anything further till we know.

"Osborn: Unless he should happen to give you a call and —— something like that, then you just tell him, whenever you happen to run into him.

"Vick: Well, he's not apt to call, cause see

"Osborn: You were very circumspect.

"Vick: Yeah. We haven't talked really definite and I think he clearly understands. Now, he might, it seemed to me that maybe he thought I was joking or, you know.

"Osborn: That's a good way to leave it, he's the one that brought it up.

"Vick: That's right.

"Osborn: ——

"Vick: Well, I knew he would before I went down there.

"Osborn: Well, ——

"Vick: Huh?

"Osborn: I'll be talking to you.

"Vick: I'll wait a day or two.

"Osborn: Yeah. I would.

"Vick: Before I contact him. Don't want to seem anxious and er

"Osborn: ——

"Vick: O. K. See you later."

MR. JUSTICE DOUGLAS, dissenting in *Osborn* v. *United States* and *Lewis* v. *United States, ante,* p. 206; and concurring with MR. JUSTICE CLARK in *Hoffa* v. *United States, ante,* p. 293.

These cases present important questions of federal law concerning the privacy of our citizens and the breach of that privacy by government agents. *Lewis* v. *United States* involves the breach of the privacy of the home by a government agent posing in a different role for the purpose of obtaining evidence from the homeowner to convict him of a crime. *Hoffa* v. *United States* raises the question whether the Government in that case induced a friend of Hoffa's to insinuate himself into Hoffa's entourage, there to serve as the Government's eyes and ears for the purpose of obtaining incriminating evidence. *Osborn* v. *United States* presents the question whether the Government may compound the invasion of privacy by using hidden recording devices to record incriminating statements made by the unwary suspect to a secret federal agent.

Thus these federal cases present various aspects of the constitutional right of privacy. Privacy, though not expressly mentioned in the Constitution, is essential to the exercise of other rights guaranteed by it. As we recently said in *Griswold* v. *Connecticut,* 381 U. S. 479, 484:

> "[S]pecific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. . . . Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one . . . . The Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' "

We are rapidly entering the age of no privacy, where everyone is open to surveillance at all times; where there are no secrets from government. The aggressive breaches of privacy by the Government increase by geometric proportions. Wiretapping and "bugging" run rampant, without effective judicial or legislative control.

Secret observation booths in government offices and closed television circuits in industry, extending even to rest rooms, are common.[1] Offices, conference rooms,

---

[1] See generally Hearings before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, Invasions of Privacy, 89th Cong., 1st Sess. (1965).

hotel rooms, and even bedrooms (see *Irvine* v. *California,* 347 U. S. 128) are "bugged" for the convenience of government. Peepholes in men's rooms are there to catch homosexuals. See *Smayda* v. *United States,* 352 F. 2d 251. Personality tests seek to ferret out a man's innermost thoughts on family life, religion, racial attitudes, national origin, politics, atheism, ideology, sex, and the like.[2] Federal agents are often "wired" so that their conversations are either recorded on their persons (*Lopez* v. *United States,* 373 U. S. 427) or transmitted to tape recorders some blocks away.[3] The Food and Drug Administration recently put a spy in a church organization.[4] Revenue agents have gone in the disguise of Coast Guard officers.[5] They have broken and entered homes to obtain evidence.[6]

Polygraph tests of government employees and of employees in industry are rampant.[7] The dossiers on all citizens mount in number and increase in size. Now they are being put on computers so that by pressing one button all the miserable, the sick, the suspect, the unpopular, the offbeat people of the Nation can be instantly identified.[8]

---

[2] See generally Hearings before a Subcommittee of the House Committee on Government Operations, Special Inquiry on Invasion of Privacy, 89th Cong., 1st Sess. (1965); Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, Psychological Tests and Constitutional Rights, 89th Cong., 1st Sess. (1965).

[3] See, *e. g.,* Hearings before the Subcommittee on Administrative Practice and Procedure, *supra,* n. 1, pt. 2, at 389.

[4] *Id.,* at 783.

[5] *Id.,* pt. 3, at 1356.

[6] *Id.,* at 1379, 1415.

[7] See generally Hearings before a Subcommittee of the House Committee on Government Operations, Use of Polygraphs As "Lie Detectors" By the Federal Government, 88th Cong., 2d Sess. (1964).

[8] See generally Hearings before a Subcommittee of the House Committee on Government Operations, The Computer and Invasion of Privacy, 89th Cong., 2d Sess., July 26, 27, and 28, 1966.

These examples and many others demonstrate an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will.

We have here in the District of Columbia squads of officers who work the men's rooms in public buildings trying to get homosexuals to solicit them. See *Beard* v. *Stahr*, 200 F. Supp. 766, 768, judgment vacated, 370 U. S. 41. Undercover agents or "special employees" of narcotics divisions of city, state, and federal police actively solicit sales of narcotics. See generally 31 U. Chi. L. Rev. 137, 74 Yale L. J. 942. Police are instructed to pander to the weaknesses and craven motives of friends and acquaintances of suspects, in order to induce them to inform. See generally Harney & Cross, The Informer in Law Enforcement 33–44 (1960). In many cases the crime has not yet been committed. The undercover agent may enter a suspect's home and make a search upon mere suspicion that a crime will be committed. He is indeed often the instigator of, and active participant in, the crime—an *agent provocateur*. Of course, when the solicitation by the concealed government agent goes so far as to amount to entrapment, the prosecution fails. *Sorrells* v. *United States*, 287 U. S. 435; *Sherman* v. *United States*, 356 U. S. 369. But the "dirty business" (*Olmstead* v. *United States*, 277 U. S. 438, 470 (Mr. Justice Holmes dissenting)) does not begin or end with entrapment. Entrapment is merely a facet of a much broader problem. Together with illegal searches and seizures, coerced confessions, wiretapping, and bugging, it repre-

sents lawless invasion of privacy. It is indicative of a philosophy that the ends justify the means.[9]

We are here concerned with the manner in which government agents enter private homes. In *Lewis* the undercover agent appeared as a prospective customer. Tomorrow he may be a policeman disguised as the grocery deliveryman or telephone repairman, or even a health inspector.[10] Cf. *Frank* v. *Maryland,* 359 U. S. 360; *Eaton* v. *Price,* 364 U. S. 263.

We said in *Gouled* v. *United States,* 255 U. S. 298, 306:

> "[W]hether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the Government of the United States by stealth, or through

---

[9] We know from the Hearings before Senate and House Committees that the Government is using such tactics on a gargantuan scale and has become callous of the rights of the citizens.

The attitude that those investigated for crime have fewer constitutional rights than others has currency:

"Senator LONG. I am curious as to whether you have a different set of principles, different standards, a different view as to the constitutional rights and privileges where the OCD is involved and where the ordinary taxpayer is involved?

"Mr. WILSON. It is pretty much a matter of fight fire with fire. Yes, I think to a degree there is a different feeling when you are working on organized crime.

"Senator LONG. In other words, you say one has constitutional rights and the other one does not?

"Mr. WILSON. No, we don't say that.

"Senator LONG. You act like it, though, don't you?

"Mr. WILSON. I am afraid you are right."

Hearings before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, Invasions of Privacy, *supra,* n. 1, pt. 3, at 1477 (1965).

[10] We are told that raids by welfare inspectors to see if recipients of welfare have violated eligibility requirements flout the Fourth Amendment. See Reich, Midnight Welfare Searches and the Social Security Act, 72 Yale L. J. 1347 (1963).

social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence, falls within the scope of the prohibition of the Fourth Amendment . . . ."

Entering another's home in disguise to obtain evidence is a "search" that should bring into play all the protective features of the Fourth Amendment. When the agent in *Lewis* had reason for believing that petitioner possessed narcotics, a search warrant should have been obtained.[11]

---

[11] In *Lewis,* a federal narcotics agent, posing as an operator of a bar and grill, went to petitioner's home for the purpose of obtaining narcotics from him. He had no search warrant, though there were grounds for obtaining one. Agent Cass testified that he had been assigned to investigate narcotics activities in the Boston area in June 1963. He became acquainted with one Gold, a friend of petitioner,* from whom he learned that one might obtain marihuana from the petitioner. It was then that Agent Cass, representing himself as "Jimmy the Pollack," telephoned the petitioner stating "a friend of ours told me you have some pretty good grass [marihuana]." Petitioner replied, "Yes, he told me about you, Pollack . . . I believe, Jimmy, I can take care of you." When Cass told him that he needed five bags, petitioner gave him his address and directions, and told him to come right over. On the basis of our prior decisions this information would certainly have made a sufficient showing of probable cause to justify the issuance of a warrant. Yet none was sought or obtained.

 * "[W]hen we approached the narcotic trafficker to purchase drugs for evidence, our credentials need to be good—almost impeccable. Usually considered as good credentials is an introduction by an accepted criminal who vouches for our agent. In this category the informer can supply the entree which otherwise might never be attained. Working under cover, we have sometimes been embarrassed by the informer's fulsome description of our rogue qualifications." Harney & Cross, The Informer in Law Enforcement 18–19 (1960). See Pritt, Spies and Informers in the Witness-Box (1958).

Almost every home is at times used for purposes other than eating, sleeping, and social activities. Are the sanctity of the home and its privacy stripped away whenever it is used for business? If so, what about the "mom and pop" grocery store with living quarters in the rear? What about garment workers who do piecework at home? What about saddle makers and shoemakers who have their shops in their homes? Are those proprietors stripped of privacy because customers come into the living quarters on business matters? What about the insurance agent who works out of his home? Is the privacy of his home shattered because he sells insurance there? And the candidate who holds political conferences in his home? Or the householder who consults with his attorney or accountant in his home? Are their homes transformed into public places which the Government may enter at will merely because they are occasionally used for business? I think not. A home is still a sanctuary, however the owner may use it. There is no reason why an owner's Fourth Amendment rights cannot include the right to open up his house to limited classes of people. And, when a homeowner invites a friend or business acquaintance into his home, he opens his house to a friend or acquaintance, not a government spy.

This does not mean he can make his sanctuary invasion-proof against government agents. The Constitution has provided a way whereby the home can lawfully be invaded, and that is with a search warrant. Where, as here, there is enough evidence to get a warrant to make a search I would not allow the Fourth Amendment to be short-circuited.

We downgrade the Fourth Amendment when we forgive noncompliance with its mandate and allow these easier methods of the police to thrive.

A householder who admits a government agent, knowing that he is such, waives of course any right of privacy. One who invites or admits an old "friend" takes, I think, the risk that the "friend" will tattle and disclose confidences or that the Government will wheedle them out of him. The case for me, however, is different when government plays an ignoble role of "planting" an agent in one's living room or uses fraud and deception in getting him there. These practices are at war with the constitutional standards of privacy which are parts of our choicest tradition.

The formula approved today by the Court in *Hoffa* v. *United States, ante,* p. 293, makes it possible for the Government to use willy-nilly, son against father, nephew against uncle, friend against friend to undermine the sanctity of the most private and confidential of all conversations. The Court takes the position that whether or not the Government "placed" Partin in Hoffa's councils is immaterial. The question of whether the Government planted Partin or whether Hoffa was merely the victim of misplaced confidence is dismissed as a "verbal controversy . . . unnecessary to a decision of the constitutional issues." *Hoffa* v. *United States, ante,* at 295. But, very real differences underlie the "verbal controversy." As I have said, a person may take the risk that a friend will turn on him and report to the police. But that is far different from the Government's "planting" a friend in a person's entourage so that he can secure incriminating evidence. In the one case, the Government has merely been the willing recipient of information supplied by a fickle friend. In the other, the Government has actively encouraged and participated in a breach of privacy by sending in an undercover agent. If *Gouled* is to be followed, then the Government unlawfully enters a man's home when its agent crawls through a window, breaks down a door, enters surreptitiously, or,

as alleged here, gets in by trickery and fraud. I therefore do not join in the *Hoffa* opinion.

I agree with MR. JUSTICE CLARK that the petition in that case should be dismissed as improvidently granted. The two lower courts found that Partin was not planted by the Federal Government in Hoffa's entourage. And I cannot say that those findings are clearly erroneous.

The trial court found: "I would further find that the government did not place this witness Mr. Partin in the defendants' midst or have anything to do with placing him in their midst, rather that he was knowingly and voluntarily placed in their midst by one of the defendants." The Court of Appeals held that this finding was supported by substantial evidence and not clearly erroneous. 349 F. 2d 20, 36. "A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275. At times there are questions of law that may undercut two concurrent findings of fact.[12] See *Graver Mfg. Co.* v. *Linde Co., supra,* at 280 (concurrence); *Gonzales* v. *United States,* 364 U. S. 59, 66 (dissent); *Blau* v. *Lehman,* 368 U. S. 403, 408–409. But I see no such difficulty here.

It is true that in cases from state courts involving federal constitutional rights we are careful to review findings of fact lest a state rule undercut the federal claim. *Norris* v. *Alabama,* 294 U. S. 587, 590; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659; *Watts* v. *Indiana,* 338

---

[12] Compare the cases from state courts dealing with the question whether a confession has been coerced contrary to the requirements of the Fourteenth Amendment, where the Court weighs only the undisputed facts. *Ashcraft* v. *Tennessee,* 322 U. S. 143, 153, 154; *Malinski* v. *New York,* 324 U. S. 401, 404; *Thomas* v. *Arizona,* 356 U. S. 390, 402–403; *Rogers* v. *Richmond,* 365 U. S. 534, 546.

U. S. 49, 51; *Napue* v. *Illinois*, 360 U. S. 264, 271; *Haynes* v. *Washington*, 373 U. S. 503, 515–516; *Jacobellis* v. *Ohio*, 378 U. S. 184, 187–188. In those cases a question of fact and a question of law are usually intertwined, *e. g.*, is a confession "voluntary," is a book "obscene" and the like. Here the question for the factfinders was whether Partin was "planted" on petitioner or whether petitioner was the victim of misplaced confidence. This is not a case where "a conclusion" is "drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights." *Watts* v. *Indiana, supra,* at 51. I would apply the same legal criteria as THE CHIEF JUSTICE, once the facts are found. If we were the original factfinders the question would not be an open-and-shut one for me. But the concurrent findings by the lower courts have support in the evidence and I would let them stand.

Once electronic surveillance, approved in *Lopez* v. *United States,* 373 U. S. 427, is added to the techniques of snooping which this sophisticated age has developed, we face the stark reality that the walls of privacy have broken down and all the tools of the police state are handed over to our bureaucracy on a constitutional platter. The Court today pays lip service to this danger in *Osborn* v. *United States,* but goes on to approve what was done in the case for another reason. In *Osborn,* use of the electronic device to record the fateful conversation was approved by the two judges of the District Court in advance of its use.[13] But what the Court overlooks is

---

[13] The recent regulation of the Federal Communications Commission that bans the use of monitoring devices "unless such use is authorized by all of the parties engaging in the conversation" (31 Fed. Reg. 3400) is of course applicable only when air waves are used; and it does not apply to "operations of any law enforcement officers conducted under lawful authority." *Ibid.* If *Silverman* v. *United*

that the Fourth Amendment does not authorize warrants to issue for *any* search even on a showing of probable cause. The first clause of the Fourth Amendment reads:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

As held in *Boyd* v. *United States,* 116 U. S. 616, a validly executed warrant does not necessarily make legal the ensuing search and seizure.

> "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never

---

*States,* 365 U. S. 505, is read in the context of our prior decisions, then the majority view is that the use of an electronic device to record a conversation in the home is not a "search" within the meaning of the Fourth Amendment, unless the device itself penetrates the wall of the home. Section 605 of the Federal Communications Act, 48 Stat. 1103, 47 U. S. C. § 605, that governs the interception of communications made "by wire or radio" reaches only the problem of the persons to whom the message may be disclosed by federal agents as well as others (*Nardone* v. *United States,* 302 U. S. 379, 308 U. S. 338), not the practice itself.

Though § 605 protects communications "by wire or radio," the Court in *On Lee* v. *United States,* 343 U. S. 747, 754, held that § 605 was not violated when a narcotics agent wearing an electronic device entered the combination home and office of a suspect and engaged him in conversation which was broadcast to another agent stationed outside. "Petitioner [the suspect] had no wires and no wireless. There was no interference with any communications facility which he possessed or was entitled to use. He was not sending messages to anybody or using a system of communications within the Act."

If that decision stands, then § 605 extends no protection to messages intercepted by the use of electronic devices banned by the new 1966 Federal Communications Commission rule.

been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. [*Entick* v. *Carrington,* 19 How. St. Tr. 1029.] Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other." *Id.,* at 630.

It was accordingly held in *Gouled* v. *United States, supra,* at 309, that a search warrant "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding" but only to obtain contraband articles or the tools with which a crime had been committed. That decision was by a unanimous Court in 1921, the opinion being written by Mr. Justice Clarke. That view has been followed (*United States* v. *Lefkowitz,* 285 U. S. 452, 465; *Harris* v. *United States,* 331 U. S. 145, 154; *United States* v. *Rabinowitz,* 339 U. S. 56, 64) with the result that today a "search" that respects all the procedural proprieties of the Fourth Amendment is nonetheless unconstitutional if it is a "search" for testimonial evidence.

As already indicated, *Boyd* v. *United States, supra,* made clear that if the barriers erected by the Fourth Amendment were not strictly honored, serious invasions of the Fifth Amendment might result. Encouraging a person to talk into a concealed "bug" may not be compulsion within the meaning of the Fifth Amendment. But allowing the transcript to be used as evidence against the accused is using the force and power of the law to

make a man talk against his will, just as is the use of a warrant to obtain a letter from the accused's home and allowing it as evidence. "[I]llegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." 116 U. S., at 635. The fact that the officer could have testified to his talk with Osborn is no answer. Then an issue of credibility between two witnesses would be raised. But the tape recording carrying the two voices is testimony introduced by compulsion and, subject to the defense that the tape was "rigged," [14] is well nigh conclusive proof.

I would adhere to *Gouled* and bar the use of all testimonial evidence obtained by wiretapping or by an electronic device. The dangers posed by wiretapping and electronic surveillance strike at the very heart of the democratic philosophy. A free society is based on the premise that there are large zones of privacy into which the Government may not intrude except in unusual circumstances. As we noted in *Griswold* v. *Connecticut, supra,* various provisions of the Bill of Rights contain this aura of privacy, including the First, Third, Fourth, Fifth, and the Ninth Amendments.[15] As respects the

---

[14] Rigging is easy for the expert. See Dash, The Eavesdroppers 367–371 (1959): ". . . the tape to be edited is played on a machine which can be instantaneously stopped at will. When a word or passage occurs which is to be deleted, the machine is stopped, the piece of tape containing the unwanted section is cut out, and the two loose ends are spliced. The words cut out can be inserted in whole or in part somewhere else. Sentences can be rearranged. New words can be dubbed in by an impersonator or made up of sounds taken from other words." *Id.,* 369.

". . . a skilfully edited tape cannot be detected with equipment readily available." *Id.,* 371.

[15] "The ninth amendment should be permitted to occupy its rightful place in the Constitution as a reminder at the end of the Bill of Rights that there exist rights other than those set out in the

Fourth, this premise is expressed in the provision that the Government can intrude upon a citizen's privacy only pursuant to a search warrant, based upon probable cause, and specifically describing the objects sought. And, the "objects" of the search must be either instrumentalities or proceeds of the crime. But wiretapping and electronic "bugging" invariably involve a search for mere evidence. The objects to be "seized" cannot be particularly described; all the suspect's conversations are intercepted. The search is not confined to a particular time, but may go on for weeks or months. The citizen is completely unaware of the invasion of his privacy. The invasion of privacy is not limited to him, but extends to his friends and acquaintances—to anyone who happens to talk on the telephone with the suspect or who happens to come within the range of the electronic device. Their words are also intercepted; their privacy is also shattered. Such devices lay down a dragnet which indiscriminately sweeps in all conversations within its scope, without regard to the nature of the conversations, or the participants. A warrant authorizing such devices is no different from the general warrants the Fourth Amendment was intended to prohibit.

Such practices can only have a damaging effect on our society. Once sanctioned, there is every indication that their use will indiscriminately spread. The time may come when no one can be sure whether his words are being recorded for use at some future time; when every-

---

first eight amendments. It was intended to preserve the underlying theory of the Constitutional Convention that individual rights exist independently of government, and to negate the Federalist argument that the enumeration of certain rights would imply the forfeiture of all others. The ninth is simply a rule of construction, applicable to the entire constitution." Comment, The Uncertain Renaissance of the Ninth Amendment, 33 U. Chi. L. Rev. 814, 835 (1966).

354

one will fear that his most secret thoughts are no longer his own, but belong to the Government; when the most confidential and intimate conversations are always open to eager, prying ears. When that time comes, privacy, and with it liberty, will be gone. If a man's privacy can be invaded at will, who can say he is free? If his every word is taken down and evaluated, or if he is afraid every word may be, who can say he enjoys freedom of speech? If his every association is known and recorded, if the conversations with his associates are purloined, who can say he enjoys freedom of association? When such conditions obtain, our citizens will be afraid to utter any but the safest and most orthodox thoughts; afraid to associate with any but the most acceptable people. Freedom as the Constitution envisages it will have vanished.

I would reverse *Lewis* and *Osborn* and dismiss *Hoffa.*