PEOPLE v HENLEY

1. CRIMINAL LAW—DEFENSES—ENTRAPMENT—OBJECTIVE TEST—CON-
DUCT OF POLICE.

The objective test of entrapment is applied by looking to the
conduct of the police; if the crime was manufactured by the law
enforcement officers, the defendant was entrapped.

2. CRIMINAL LAW—ENTRAPMENT—WILLINGNESS TO COMMIT CRIME—
DELIVERY OF HEROIN.

A defendant convicted of delivery of heroin was not entrapped
where the facts demonstrate that he was ready and willing to
commit the crime whenever the opportunity to do so arose and
on each of several occasions, when requested by a police under-
cover agent to furnish drugs, the defendant left his premises
and obtained the heroin without delay from sources apparently
well known to him.

3. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES.

A police undercover agent was not a res gestae witness where the
agent had arranged delivery of drugs on occasions previous to
the occurrence for which the defendant was charged, but was
not present during the events leading up to or at the time of
the delivery in question.

Appeal from Genesee, Thomas C. Yeotis, J. Sub-
mitted Division 2 June 10, 1974, at Lansing.
(Docket No. 18319.) Decided July 24, 1974.

Theodore W. Henley was convicted of unlawful
delivery of heroin. Defendant appeals. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law §§ 143–145.
[2] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 38, 43, 46, 47.
  Entrapment to commit offense with respect to narcotics law. 33
    ALR2d 883.
[3] 29 Am Jur 2d, Evidence §§ 708, 713.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, and *Donald A. Kuebler,* Chief, Appellate Division, for the people.

*Shaheen & Shaheen,* for defendant on appeal.

Before: QUINN, P. J., and V. J. BRENNAN and CARLAND,* JJ.

CARLAND, J. The defendant was charged and convicted in a nonjury trial of the unlawful delivery of heroin in violation of the provisions of MCLA 335.341; MSA 18.1070 (41) (controlled substances act of 1971). The defendant appeals as a matter of right.

The charged offense occurred on June 12, 1972 and while admitting the delivery of heroin on that date, the defendant raises the defense of entrapment. Because of this admission, there is little dispute, if any, concerning the essential facts in this case, but since our determination of this issue must rest upon the particular facts attendant hereto, these facts must be stated. The facts are largely gleaned from the defendant's own testimony.

For some time prior to the date in question, a Michigan State Police narcotics unit had been conducting an investigation into the drug traffic being carried on in the City of Flint. During the course of this investigation, the state police availed themselves of the services of an undercover agent known to the record as "IL 367" and "Bob" as he is hereinafter referred to. Such agent while employed at a General Motors plant became acquainted with a fellow employee, one Michael

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Johnson. Mike, as he is referred to throughout the record, is a cousin of the defendant. Apparently Bob was able to convince Mike that he was a user of narcotics and was anxious to learn of sources from which his needs might be supplied. Mike steadfastly maintained that he had no knowledge of such sources.

Eventually, however, Bob was introduced to the defendant by Michael Johnson. At this first meeting drugs were discussed and the defendant was asked by Bob to purchase some drugs for him. The defendant at that time asserted that he couldn't get any. At a second meeting a few days later, the request was repeated and heroin was promptly furnished by the defendant.

The defendant testified that his next contact with Bob occurred on May 23, 1972 when the agent drove up in a truck accompanied by another person, "Terry", who was introduced to him as Bob's brother. Mike was also present on this occasion and advised the defendant that Bob wanted him to get something for him. The defendant approached the truck and was again requested to furnish drugs to Bob. In response to this request, the defendant testified as follows:

"*Q.* Okay, did you speak with Bob at that time?

"*A.* Yes, I approached the truck. It was a white tow truck. I approached the truck and I had a conversation with Bob and he told me what he wanted you know. He explained to me that he wanted me to get him some more drugs.

"*Q.* Okay, and what did you do then?

"*A.* Well, I didn't argue the point with him. I told him to give me the money and I went and got them for him."

Again on May 31st, two cars were driven to the vicinity of the defendant's home. Mike got out of

one car and asked the defendant if he could get some "stuff" for Bob. The defendant then looked into the other car and observed Bob and his brother Terry and a third person with whom he was not acquainted. This third person was later identified as Police Officer Dolan. Bob repeated the request for drugs. The defendant left and came back with "stuff" which he delivered to Dolan. Arrangements were then made whereby Dolan might procure drugs from the defendant in the future.

The events upon which the present charge is based arose on June 12, 1972. A request at that time was made by Dolan that the defendant get him something. The following testimony of the defendant discloses a lack of pressure by the police and a willingness on the part of the defendant to furnish narcotics:

"I went to the door. It was Dolan. He said 'Hi, Teddy, remember me?'

. "At first I didn't remember him until I noticed the car setting in front of the house. This was what made me remember him.

"And I said, 'Oh, yeah. What's happening, do you know?'

"And he said, 'Do you think you can get me something?'

"And I said, 'I don't know, man, but we can go see.'

"And then I—he said, 'Okay.'

"And I told my mother I'd be right back, and we left and went and got in the car.

"I then stated to Dolan they should drive down to Church Street and make a right and stop at the corner of Ninth and Church. He does like I asked.

"And he then asked me, he said, 'How much is it here, man?'

"I said, '$10.00.' And he gave me the money and I got out the car, went down to the house where I was

supposed to make the buy at but the guy didn't have anything.

"So I came back to the car and I told Dolan this and he didn't say, well, he said, 'The guy didn't have anything?'

"I said, 'No, but I might be able to get something else for you on the north side if you want to go over there.'

"He said, 'Yeah, okay. How do we get there?'

"And then I directed him to the house on Oren and Harriet and we parked on the corner. I say, 'Well I don't know how much it is here, man, I think it's twenty-five or thirty dollars.'

"Dolan said, 'Yes, twenty-five or thirty dollars.'

"And I said, 'Yes, if it's only twenty-five I'll bring you five dollars back.' He then gave me $30.00.

"I went into the house, made the buy, came back to the car and gave him the stuff."

It should be further noted that on none of the occasions the defendant had drugs in his possession at the time he was requested to furnish them. In every instance, the defendant left his premises and obtained the drugs without delay from sources apparently well known to him. Heroin was furnished on each occasion.

In *People v Turner,* 390 Mich 7; 210 NW3d 336 (1973), our Supreme Court, in deciding the issue of entrapment there raised, adopted the objective test enunciated by Mr. Justice Stewart in his minority opinion in *United States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973). In applying this objective test, it is held that the court must look to the conduct of the police officers before a determination can be made as to whether the defendant was entrapped. He was entrapped if the crime was manufactured by the enforcement officers. On page 439 of *Russell,* the Justice speaks as follows:

"It is common ground that 'the conduct with which the defense of entrapment is concerned is the *manufac-*

*turing* of crime by law enforcement officials and their agents.' *Lopez v United States,* 373 US 427, 434; 83 S Ct 1381, 1385; 10 L Ed 2d 462, 468 (1963). For the government cannot be permitted to instigate the commission of a criminal offense in order to prosecute someone for committing it. *Sherman v United States,* 356 US 369, 372; 78 S Ct 819, 821; 2 L Ed 2d 848, 851 (1958). As Mr. Justice Brandeis put it, the government 'may not provoke or create a crime and then punish the criminal, its creature'. *Casey v United States,* 276 US 413, 423; 48 S Ct 373, 376; 72 L Ed 632, 636 (1928)."

Again on pages 444–445 of *Russell, supra,* we find the following:

"In my view, a person's alleged 'predisposition' to crime should not expose him to government participation in the criminal transaction that would be otherwise unlawful."

"This does not mean, of course, that the government's use of undercover activity, strategy, or deception is necessarily unlawful. *Lewis v United States,* 385 US 206, 208–209; 87 S Ct 424, 426; 17 L Ed 2d 312, 315 (1966). Indeed, many crimes, especially so-called victimless crimes, could not otherwise be detected. Thus, government agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so. *Osborn v United States,* 385 US 323, 331–332; 87 S Ct 429, 434; 17 L Ed 2d 394, 400 (1966). See also *Sherman v United States, supra,* at 383–384; 78 S Ct at 826; 2 L Ed 2d at 857 (Frankfurter, J., concurring).

"But when the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity, and when their conduct *is of a kind that could* induce or instigate the commission of a crime by one not ready and willing to commit it, then—regardless of the character or propensities of the particular person induced—I think entrapment has occurred. For in that situation, the Government has engaged in the impermissible manufacturing of crime, and the federal courts should bar the prosecution in order to preserve the

institutional integrity of the system of federal criminal justice."

Applying the so-called objective test in *People v Turner,* the court's dismissal of the charges against the defendant was based upon a finding of entrapment. *A fortiori* the court must have found the defendant to have been one not ready and willing to commit the crime and that, therefore, the officers had engaged in the manufacture of the offense.

Applying the same test to the facts in the case at bar, we find that the investigation being conducted by the state police involving the drug traffic in the City of Flint to have been legitimate and proper in every respect. The use of undercover agents and the establishment of the confidential relationship with suspected drug peddlers are perhaps the only weapons by which society can combat the traffic which exacts such a devastating toll of its victims and society in general. It is a rare instance in which drugs are sold to strangers. The facts clearly demonstrate the defendant to have been ready and willing to commit the crime whenever the opportunity to do so arose. The crime was not manufactured by the police and thus the defendant was not entrapped.

During the course of the trial, the defendant moved to force the endorsement on the information of the name of the undercover agent IL 367, it being claimed that he was a res gestae witness. The trial court was correct in his denial of this motion. The record discloses that on the night of June 12, 1972 the agent was at no time present during the happening of the events leading up to or at the time of the delivery of the heroin to Officer Dolan by the defendant. This is the offense with which the defendant stands charged and any

prior delivery of drugs by the defendant either to the agent or at times when the agent was present are not relevant to this prosecution.

We affirm.

All concurred.