UNITED STATES of America, Plaintiff,

v.

Robert Jay MEINSTER, Robert Elliot Platshorn, Lynne Platshorn, Eugene Arter Myers, Randall Gene Fisher, Modesto Echezarreta, Richard Elliott Grant, Jr., Mark Steven Phillips and Carl Jerry London, Defendants.

No. 79–165–CR–JLK.

United States District Court,
S. D. Florida,
Miami Division.

April 29, 1980.

**1344**

Dana Biehl, Sp. Atty., U. S. Dept. of Justice, Narcotics & Dangerous Drugs, Washington, D.C., for plaintiff.

Dennis Cogan, Philadelphia, Pa., for Robert Jay Meinster.

William P. Cagney, III, Miami, Fla., for Robert Elliot Platshorn.

Melvyn Kessler, Miami, Fla., for Lynne Platshorn.

Theodore Klein, Rebekah J. Poston, Miami, Fla., for Eugene Arter Myers.

Samuel Sheres, Hallandale, Fla., for Randall Gene Fisher.

Gerald Kogan, Miami, Fla., for Modesto Echezarreta-Cruz.

Michael Brodsky, Miami, Fla., for Richard Elliot Grant, Jr.

Arthur W. Tifford, Miami, Fla., for Mark Steven Phillips.

Denis Dean, Miami, Fla., for Carl Jerry London.

## ORDER DENYING MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

JAMES LAWRENCE KING, District Judge.

This matter arose upon the motion of defendant Meinster for a new trial based on newly discovered evidence. The newly discovered evidence asserted by the defendant is stated in the following conclusory fashion: "The instantly complained of error involves the recent disclosure that the government's strike force attorneys involved the trial judge in their investigatory and prosecutorial roles by enlisting his assistance, in the midst of the trial, in surreptitiously sending an informant into the prison to question and converse with the defendant Robert Meinster in an effort to include him in their forthcoming indictment charging obstruction of justice." This conclusory allegation is belatedly supported by the single affidavit of Meinster's attorney in another case. The affidavit reports what a government attorney stated, to the effect that this Court was informed that defendant Platshorn would request to be visited by someone who would be, in reality, a government informant.

I.

Embedded in the defendant's motion is the contention that the Court should have *sua sponte* recused itself during the course of the trial. *See* Defendant's Memorandum at [2]. Hence, in ruling on this motion, the Court must consider not only the standards governing motions for a new trial based on newly discovered evidence but also the standards for the disqualification of judges. The latter issue is not a new one to this case. *See* pp. 1347–1348 *infra*.

To succeed on a motion for a new trial based on newly discovered evidence, the defendant must prove the following elements:

The evidence must be discovered following trial; there must have been diligence on the part of the movant to discover the new evidence; the evidence is not merely cumulative or impeaching; the evidence is material; and a new trial would probably produce a new result. *United States v. Zicree*, 605 F.2d 1381, 1390 (5th Cir. 1979) *quoting United States v. Prior*, 546 F.2d 1254, 1258 (5th Cir. 1977). *See also* C. Wright, 2 Federal Practice & Procedure § 557 at 515 (1969). Although some motions styled as motions for a new

trial based on newly discovered evidence may be judged by other standards,[1] the present motion does not fall into one of those exceptions.

The essence of the defendant's claim is that the new evidence demonstrates that the Court should have recused itself. However, without some communication to the jury of some purported bias on the part of the Court, it is hard to see how the defendant can satisfy the requirement that "a new trial would probably produce a new result." *United States v. Zicree*, 605 F.2d at 1390. The jury weighed the facts in this trial and determined the defendant's guilt by applying those facts to proper instructions on the law. The Court is completely unpersuaded that a new trial would result in a different outcome.

An independent ground for denying the new trial motion is that the recusal the defendants contend should have occurred during the trial would not have been warranted. Two statutory provisions pertain to the disqualification of judges: 28 U.S.C. §§ 144 and 455. Section 144 would have been unavailable to the defendant,[2] and so only Section 455 is implicated in the present motion.

■ A recent Fifth Circuit case clearly sets out the standards for disqualification under Section 455. *In re Corrugated Container Antitrust Litigation*, 614 F.2d 958 (5th Cir. 1980). To warrant the disqualification of a judge under Section 455, a party must allege "*personal, extrajudicial bias* or the appearance of partiality arising out of such bias." *Id.*, at 965 (emphasis added). In testing the sufficiency of the allegations made by the party, the Fifth Circuit noted that the Court must "accept as true the allegations contained in the affidavits." *Id.* at 967.

■ Here, the defendant has supplied a single affidavit in which Mr. Denis Dean recounts what a government attorney, Mr. Edward Hanna, told him about a conversation with the Court. What the affidavit does not reflect is that the government's alleged contact with the Court was not through Mr. Hanna, but rather by a telephone call from Mr. John Evans, another Strike Force attorney. Thus in the affidavit Mr. Dean swears to his report of what Mr. Hanna said based upon a report by Mr. Evans of a conversation with the Court. Such an affidavit constitutes triple hearsay. The Court has grave doubts that in such a situation the Supreme Court or the Fifth Circuit intended that the allegations in the affidavit must be accepted as true,[3] particu-

---

1. For instance, evidence of irregularities or misconduct involving the jury may be treated as motions based upon newly discovered evidence for the purpose of the time period in which such motions may be filed. *See* C. Wright, *supra* § 554 at 495. However, the test on jury misconduct is that a verdict may not stand if such misconduct has occurred unless it can be clearly determined that no prejudice resulted. *Id.* § 554. The instant motion is not based on juror irregularities or conduct. Another standard used on motions for new trial involves allegations of prosecutorial or judicial misconduct affecting the jury during the trial. In these cases, the motion for a new trial will be granted if the prosecutorial or judicial misconduct undermined the defendant's right to a fair trial by improperly influencing the jury. *See generally id.* § 555. In particular, because of his or her influence with the jury, a judge must be scrupulous to avoid any conduct which would indicate to the jury his or her personal views on the guilt or innocence of the defendant. In this case, however, the defendant has not alleged any judicial conduct which improperly influenced the jury.

2. Section 144 provides that a party may file only one affidavit alleging personal bias in any one case. The defendant filed such an affidavit in September following the revocation of his bond.

3. When the Supreme Court announced its rule that the truth of matters asserted in an affidavit had to be accepted, the Court was interpreting the predecessor of Section 144 and the Court noted that the requirement of a sworn affidavit "is a precaution against abuse, removes the averments and belief from the irresponsibility of unsupported opinion, and adds to the certificate of counsel the supplementary aid of the penalties attached to perjury." *Berger v. United States*, 255 U.S. 22, 33, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921) (construing the predecessor of 28 U.S.C. § 144). To require that a court accept as true under Section 455 triple hearsay, albeit the sworn statement of the last declarant, leaves the court defenseless against wild and unfounded accusations.

**1346**

larly when others with greater knowledge of the conversation are available. Nonetheless, the Court applies this standard in considering the disqualification issue.[4]

■ The essence of the affidavit is as follows:

Judge King knew before hand that a request was going to be made of him on behalf of Robert Platshorn, seeking permission for "Joe Morris" to visit with Mr. Platshorn at the Federal Correctional Institute the evening of November 20, 1979. Mr. Hanna further advised that Judge King was aware of the fact that the government informant Charles Coveney was in fact the person seeking the visit at FCI that evening. Mr. Hanna further advised that the information had been brought to Judge King's attention by the government sometime after 11:00 a. m. and 2:00 p. m. November 20, 1979.

The Court notes that this affidavit does *not* support the defendant's contention that the Court *agreed* to facilitate a government ruse. In fact, the Court did not so agree. Rather, the affidavit merely states that the Court was made aware of a fraudulent request which was about to be made to it.

■ These facts are insufficient to constitute "personal, extrajudicial bias." All contacts between the government Strike Force attorneys and this Court arose in the judicial context. As the record in this case well documents, the Strike Force attorneys first approached the Court in an *ex parte* motion to revoke the defendant's bond. Such proceedings are part of the Court's function in its judicial capacity, and cannot constitute the basis for personal, extrajudicial prejudice. In *United States v. Jackson*, 430 F.2d 1113, 1115 (9th Cir. 1970), the Ninth Circuit held that information communicated to a judge in such an *ex parte* setting could not be the basis for disqualification:

The trial judge was informed of the alleged threats to witnesses during his participation in the case because he was presiding over the criminal proceedings lodged against appellants. The fact that the trial judge issued an order revoking appellants' bail bonds is not a disqualifying fact under these circumstances. . . . Nor is the fact that the trial judge so acted after receiving information from the United States Attorney not made known to appellants in open court.

Subsequent communications from the Strike Force to the Court were similarly in the judicial context. A court has the continuing duty to conduct an orderly trial and to protect the participants therein. If any attorney, whether for the defense or government, discovers evidence which indicates that there are plans to disrupt the proceedings, he should bring that evidence to the attention of the court. *Cf.* A.B.A. Code of Professional Responsibility, DR 7–102(B) & DR 4–101(C)(3). When such information is received by a court, it is acting in a judicial capacity. Similarly, any attorney should notify the court if he or she has reason to believe a fraud is about to be perpetrated on the court. *Cf. id.* EC 7–26 & DR 7–102(B). Again, when such information is received by a court, it is acting in its judicial capacity.

It may, of course, be argued that there must be limits to the evidence which comes to a court in its judicial capacity and the action it may take in that capacity. *See generally, Whitehurst v. Wright*, 592 F.2d 834, 838 (5th Cir. 1979)(dictum); *Davis v. Bd. of School Commissioners*, 517 F.2d 1044, 1051–52 (5th Cir. 1975). This Court can conceive of situations in which action by a judge in his judicial capacity would demonstrate such pervasive personal bias that the judge should be disqualified as a result. However, such is not the case here. In fact, the Supreme Court has affirmed as constitutional the judicial approval of the use of a government informant with a secret tape recorder to investigate alleged misconduct of a defense attorney. *See Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

■ Because the new facts alleged in the affidavit relied upon by the defend-

---

4. For the Court's account of its contact with the government, *see* pp. 1349- 1351, *infra*.

ant would not have warranted recusal during the trial, they are insufficient to support a motion for a new trial now. A hearing is not required on these allegations because of their insufficiency as a matter of law.[5]

## II.

The defendant's present motion should be placed in its proper context. Regrettably, this present motion is not the first which charges prosecutorial misconduct or seeks the Court's recusal.

Before the trial in this case began, the defendant joined in a motion which, *inter alia,* charged the government with prosecutorial misconduct in connection with some alleged internal squabbling within the Justice Department over the proper forum for prosecuting the various charges. After thorough argument by counsel, the Court concluded that the separate trials in North Carolina and Florida on charges which did not constitute double jeopardy also did not constitute a violation of due process nor an abuse of prosecutorial discretion. Thus, there was no basis for a charge of prosecutorial misconduct. *See United States v. Meinster,* 475 F.Supp. 1093, 1096 (S.D.Fla. 1979).

Also shortly before trial, the appearance bonds of the defendant and his codefendant, Robert Platshorn, were revoked following the *ex parte* presentation of evidence that both were conspiring to import massive quantities of drugs and to flee the country at the start of trial. As soon as practical, all of the government's allegations were subjected to an adversarial hearing and the

Court made detailed findings in a twenty-one page order. *See* Order Denying Bond, October 10, 1979. Following the *ex parte* government presentation, the defendant Meinster and his codefendant Platshorn moved for the Court's recusal under 28 U.S.C. ·§§ 144 & 455, claiming that the government had caused the Court to develop a personal bias against the defendants. After the better part of a day's argument on the recusal motion, the Court denied the motion in open court, concluding that under the pertinent statutes personal extrajudicial bias could not arise from evidence presented in a motion for bond revocation. In particular, the Court relied upon the remarkably similar situation in *United States v. Jackson,* 430 F.2d 1113 (9th Cir. 1970).

Also stemming in part from the evidence adduced at the bond proceedings, defendant Meinster and his codefendant Platshorn sought a hearing on alleged prosecutorial misconduct. The defendants charged that the Strike Force attorneys had violated the defendants' rights to effective assistance of counsel. After careful consideration the Court concluded that the activities of the Strike Force were entirely distinct from the prosecution team in this case and that neither defendants' Sixth Amendment rights had been violated. *See United States v. Meinster,* 478 F.Supp. 1131 (S.D.Fla.1979).

Repeatedly during the trial itself, the defendant charged prosecutorial misconduct based on varying allegations, ranging from the knowing use of perjured testimony to withholding pertinent discovery from the defendants. Each of these motions was groundless.

---

**5.** To the extent that the motion is based on prosecutorial misconduct irrespective of recusal, the Court denies relief based upon its prior order on alleged prosecutorial misconduct. *United States v. Meinster,* 478 F.Supp. 1131 (S.D.Fla.1979) *citing Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In that prior order, the Court noted:

One final word is in order. The disclosure that a person had reported a plot to assassinate witnesses and a federal prosecutor in this case was certainly a most bizarre turn of events. The Court appreciates that the head of the Strike Force had few, if any, practical

alternatives but to investigate the allegation, report to the Court, and disclose this matter to defense counsel without disclosure to the prosecution team.

478 F.Supp. at 1133–34. The events as they later unfolded in this case also left the head of the Strike Force with little choice but to investigate the various alleged plots to disrupt the trial herein and to report to the Court when necessary. The careful manner in which the Strike Force approached the Court in this case, applying first to Chief Judge Atkins, evinces the Strike Force's continuing regard for the rights of all involved.

On December 6, 1979, Strike Force attorneys interrupted the trial proceedings and disclosed to the prosecution team, the defense attorneys, and the Court that an obstruction of justice indictment had been handed down by a Miami grand jury which named several defendants in this case, including defendant Meinster, and three other individuals. The circumstances surrounding these disclosures and the Court's specific findings were set out at length in an order denying the application of defendants Myers and Grant for bond. *See United States v. Meinster*, 481 F.Supp. 1117 (S.D. Fla.1979). At the time of those disclosures, various motions for mistrials were made, in part, on the purported impossibility of the defendants receiving a fair trial when several stood accused in a separate proceeding of plotting the disruption of the trial and possibly the "involuntary removal of the judge." These motions were denied on essentially the same basis as the earlier motion for recusal. The present motion stems from the Strike Force's investigation of this alleged trial disruption conspiracy.

These motions alleging prosecutorial misconduct or seeking recusal as outlined above are simply the major instances in which the defendant has made such charges or sought such recusal. The record contains numerous similar assertions on less significant matters. One recent example occurred at the sentencing hearing when the defendant's counsel again charged prosecutorial misconduct. Apparently, several statements by the government trial attorney regarding possible foreign bank accounts of the defendant had been included in the Presentence Investigation Report compiled by the probation department. Upon the objection of the defendant, the Court indicated that those statements in the report which could not be substantiated fully by the government would be stricken. Defense counsel, however, contended that striking the offending statements would be insufficient; defense counsel requested that punitive sanctions be imposed on the government attorney and argued that the Court must recuse itself from sentencing the defendant. Both requests are frivolous.

In part, the repeated motions alleging prosecutorial misconduct or seeking the Court's recusal may be symptomatic of the strength of the government's case against this defendant and his codefendants. As Professor Wright observed:

> Convicted defendants not unnaturally grasp for any ground on which to have the verdict set aside, and attacks on the conduct of counsel—for both sides—and the judge not uncommonly are put forward as reasons why a new trial should be ordered.

Wright, *supra* § 555 at 496. With the increasing discovery available to criminal defendants, their counsel may recognize well before the verdict that alleged prosecutorial or judicial misconduct may be their only colorable argument on appeal.

Moreover, the defendant's repeated motions for recusal belie a fundamental misconception about the judicial function. During a criminal jury trial, this Court does not sit to determine the guilt or innocence of the defendants before it. That mission is the function of the jury. In contrast, the task of the Court is to answer those legal questions which arise during the course of the trial and to ensure that the trial is conducted in an orderly fashion which will protect the interests of all concerned: the defendants, the government, and the community at large. It is of little moment to the Court what verdict the jury returns on a particular defendant so long as the rights of the defendant have been scrupulously observed, the law has been followed, and the integrity of the trial as an orderly fact-finding forum has been preserved.

During the course of presiding over any criminal trial, the judge often hears much which is extremely prejudicial to a defendant but which is kept from the jury. Some information is kept from the jury because it is irrelevant, other information is excluded because it was illegally obtained, and yet other information is kept from the jury because its prejudicial impact outweighs its probative value. As long as the

jury is not exposed to the excluded information, the defendant is not prejudiced thereby.

■ Clearly, a court is not disqualified to proceed with the trial if it learns in the course of the proceedings something prejudicial to the defendant which is not properly evidence for the jury. To fulfill its role, the court *must* hear prejudicial evidence which never reaches the jury. Otherwise, no judge who granted a motion to suppress could ever then preside over a trial. Nor could a judge who permitted a defendant withdraw a guilty plea later preside over that defendant's trial. *Cf. United States v. Clark*, 605 F.2d 939 (5th Cir. 1979) (Judge not disqualified from presiding over trial after withdrawal of guilty plea even if he has read presentence report). Indeed, on occasion the Court must act on evidence not before the jury to ensure that the trial proceeds in an orderly fashion. Similarly, as long as such action is not taken in the jury's presence and is within the court's legitimate discretionary powers to supervise the proceedings, neither jury nor judge are disqualified thereby. Ironically, the court must occasionally act to protect the defendant from the prejudice of his own folly.

The defendant contends that there is a class of information which is so inherently prejudicial to the defendant that the mere mention or initial consideration of it must disqualify the judge. Although this argument has been urged most earnestly by the defendant in reference to alleged plots to disrupt the trial or harm the judge, defense counsel would also apparently include in this class of information an unsupported allegation that the defendant has foreign bank accounts, an allegation which has been stricken by the Court. Turning to the allegation that defendant Meinster was part of a conspiracy to disrupt this trial, the Court observes that it is *not* called upon to try the defendant on such a charge. If such a case is prosecuted, it will be for a jury to decide the defendant's guilt or innocence. Rather, the Court need consider evidence of such possible conspiracies only as they might affect the proceedings in this Court. To hold

that the Court must recuse itself after allegations of such a conspiracy have been made would permit mistrials at the defendant's will.

### III.

On November 7, 1979, Mr. Atlee Wampler, the head of the Miami Organized Crime Strike Force of the Justice Department petitioned Chief Judge Atkins for permission to contact this Court with respect to possible plans to disrupt the trial in this case. The meeting was stenographically reported by a court reporter. The government's presentation to Chief Judge Atkins makes clear that the Strike Force's only concern was to preserve the continuing integrity of the proceedings in this case. Chief Judge Atkins observed that the Strike Force attorneys were in a quandary. Prudence dictated that (1) they pursue investigative leads which indicated that the main defendants intended to disrupt the trial in this case, and (2) they might have to arrest the alleged participants of such a conspiracy during a four day recess in the trial. The Strike Force attorneys were very concerned that consensual tape recordings made by their confidential informant would affect the trial in this case, *cf. Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and that arrests during a recess would lead to massive publicity which would prejudice the jury in this case. Chief Judge Atkins, although doubtful of his authority to approve an approach to this Court, concluded that the Strike Force attorneys should contact this Court to protect the integrity of the trial.

The Strike Force presentation to this Court was also stenographically reported by a court reporter. During that presentation, the Court was unsure that its consent was necessary for the consensual tape recording of conversations by the means of a recorder concealed on the person of the confidential informant. *See, e. g.,* Transcript at 41. Nevertheless, the Court was concerned with the possibility that plans to disrupt the trial might jeopardize the physical safety of any of the numerous individuals connected in

some fashion with this case. *Id.* at 42–43. Thus the government was told that as far as the Court was concerned it could continue its investigation. Second, the Court determined that to protect the jury from prejudicial publicity, the government should contact the Court after any arrests were made so that the jurors could be contacted by telephone and isolated before widespread publicity occurred. The meeting with Strike Force attorneys concluded promptly thereafter.

One other contact with the Strike Force occurred on November 20, 1979. At that time, Mr. John Evans called the Court to inform it that defendant Robert Platshorn would request the Court's permission to allow a relative to visit Platshorn at the Federal Correctional Institution. The Court was told that the Strike Force had reason to believe that this request would misrepresent the facts to the Court, but that the government did not object to the granting of the motion. Immediately following this phone call, the defendant Platshorn moved for permission to have his uncle, "Joe Morris," visit him. As was the Court's invariable practice upon reasonable requests in such matters, the defendant's motion was granted.

The defendant argues that these contacts between the Court and the Strike Force resulted in "an intentional co-mingling" of "the Trial Judge's and prosecutor's respective roles." Defendant's Memorandum at [3–4]. The defendant argues that the Court should have recused itself *sua sponte* following these contacts. Clearly, however, the Court did not direct the government's investigation of the defendant. Rather, the Court was informed of those aspects of the investigation which threatened to undermine the conduct and integrity of the trial before it.

 More troublesome are the underlying implications of the defendant's position. Properly framed, the defendant raises the following question for the Court:

Can a criminal defendant who learns of an alleged plot to disrupt his trial, possibly including plans to murder the presiding judge, and who arguably participates therein, complain because:

(1) the judge was informed of the alleged plot and refused to halt the government investigation of it;

(2) the judge took measures to safeguard the integrity of the ongoing trial from prejudicial publicity which could have tainted the jury; and

(3) the judge declined to inform the defendants of the ongoing investigation?

The court's answer to this question is no. Criminal defendants are not immune from investigations of possible efforts to subvert the criminal justice system. *See generally Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *cf. Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Moreover, it is the court's function in a criminal trial to try its best to protect the rights of all the defendants from prejudicial publicity. *See, e. g., Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 2904–05, 61 L.Ed.2d 608 (1979). Finally, just as the defendant in a criminal case has no right to be arrested in the middle of that trial when he commits obstruction of justice, *Hoffa v. United States,* 385 U.S. at 310, 87 S.Ct. at 417, he has no right to be told of an investigation of possible charges of obstruction of justice.

The Court's function to supervise the integrity of trial proceedings is not a one-way street. It protects all involved with the trial, including the defendant. Could the government complain if defense attorneys informed the Court that government attorneys planned to introduce evidence the government had deliberately fabricated and the Court permitted the alleged fraud to occur outside of the jury's presence? Could the government complain if defense attorneys came forward with evidence that the prosecution was planning to cause a mistrial because they were unhappy with the course of the trial, and the Court permitted that plan to mature? Surely not.

Given the situation created by the actions of the defendants in this case, the Court had no choice but to take those minimum

actions it did take to preserve the fairness of the trial it was conducting. After careful consideration, the Court does hereby

ORDER AND ADJUDGE that the defendant's motion for a new trial based on newly discovered evidence is denied.