UNITED STATES of America, Plaintiff,

v.

Lynne PLATSHORN et al., Defendants.

No. 79–165–Cr–JLK.

United States District Court,
S. D. Florida.

May 6, 1980.

As amended July 7, 1980.

Dana Biehl, Sp. Atty., U. S. Dept. of Justice, Narcotics & Dangerous Drugs, Washington, D. C., for plaintiff.

Dennis J. Cogan, Philadelphia, Pa., for Robert Jay Meinster.

William P. Cagney, III, Miami, Fla., for Robert Elliot Platshorn.

Melvyn Kessler, Miami, Fla., for Lynne Platshorn.

Theodore Klein and Rebekah J. Poston, Miami, Fla., for Eugene Arter Myers.

Samuel Sheres, Hallandale, Fla., for Randall Gene Fisher.

Gerald Kogan, Miami, Fla., for Modesto Echezarreta-Cruz.

Michael L. Brodsky, Miami, Fla., for Richard Elliot Grant, Jr.

Arthur W. Tifford, Miami, Fla., for Mark Steven Phillips.

Denis Dean, Miami, Fla., for Carl Jerry London.

## ORDER DENYING MOTION FOR RECUSAL

JAMES LAWRENCE KING, District Judge.

This matter arose upon the motion of the defendant Lynne Platshorn for the recusal of the Court pursuant to 28 U.S.C. §§ 144 and 455. As required under Section 144, the defendant has submitted an affidavit in support of her motion.

Lynne Platshorn was named in four counts of the thirty-six count indictment in *United States v. Meinster,* 475 F.Supp. 1093 (S.D.Fla.1979). The *Meinster* trial began on September 17, 1979. After approximately one month of trial, Lynne Platshorn changed her plea to guilty on one of the four counts and the government agreed to drop the other charges at the time of sentencing. Consequently, she was severed from the lengthy trial in *United States v. Meinster.* On December 6, 1979, she was indicted on charges of conspiring to disrupt the continuing *Meinster* trial, an indictment which is pending before another judge. Lynne Platshorn then moved to withdraw her plea of guilty, a motion which this Court granted. Her present motion seeks the Court's recusal from her retrial on the original four counts of the *Meinster* indictment.

■ As has long been the law under Section 144, the facts alleged in the affidavit are accepted as true for the purpose of testing the sufficiency of the affidavit. For the purposes of this motion, the Court assumes that the facts stated in the affidavit must also be accepted as true under Section 455. *See* In re: *Corrugated Container Antitrust Litigation,* 614 F.2d 958, 967 (5th Cir. 1980) (stating that allegations must be accepted as true under Section 455 although case support cited involved only Section 144).

At the status conference on April 25, 1980, counsel for both the defendant and the government were heard on the motion and were requested by the Court to file additional memoranda on the effect of the *Corrugated Container* case. Such memoranda have since been filed and the Court has fully considered them.

■ Although the Court may not decide the truth of the facts alleged in the affidavit, there is no requirement that the Court accept the affiant's conclusions or her speculations. *Compare Parrish v. Board of Commissioners of Alabama State Bar,* 524 F.2d 98, 100 (5th Cir. 1975) (*en banc*) (*facts* must be stated "with particularity" and

*facts* must be such that they would convince a reasonable person of bias) (emphasis added) with *id.* at 108 (Tuttle, J., dissenting) (affidavit need only be sufficient to support the affiant's *belief* of partiality). *See generally,* C. Wright, A. Miller & E. Cooper, 13 *Federal Practice and Procedure* § 3551 at 374–77 (1975). *See also United States v. Haldeman,* 559 F.2d 31, 134 (D.C.Cir. 1976) (*en banc*) (*per curiam*) ("Assertions merely of a conclusionary nature are not enough, nor are opinions or rumors"), *cert. denied sub nom. Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250; *Mitchell v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Hodgson v. Liquor Salesmen's Union,* 444 F.2d 1344, 1348 (2d Cir. 1971) ("Mere conclusions, opinions, rumors or vague gossip are insufficient"). Moreover, particularly where the facts allegedly demonstrating bias are statements made or actions taken in the judicial role, they must be considered in their proper context. *See, e. g., Hepperle v. Johnston,* 590 F.2d 609, 614 (5th Cir. 1979) ("The standard for determining whether a judge should disqualify himself under § 455 is whether a reasonable person *knowing all the facts* would conclude that the judge's impartiality might be reasonably questioned") (*emphasis added*); *United States v. Archbold-Newball,* 554 F.2d 665, 682 (5th Cir. 1977) (The district judge's comments on alleged conspiracy occurred in the context of a bail hearing requiring judge to weigh evidence against the defendant).

■ All of the alleged facts included in the defendant's affidavit occurred in the judicial context and therefore are not normally sufficient to show "personal, extraju-

dicial bias" as required by both Sections 144 and 455. In re *Corrugated Container Antitrust Litigation,* 614 F.2d 958, 964–65 (5th Cir. 1980); *United States v. Meinster,* 488 F.Supp. 1342 (S.D.Fla.1980) (Order Denying Motion For New Trial Based On Newly Discovered Evidence). However, as the defendant's memorandum correctly points out, there is an exception to this general rule "where such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against the party." *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1051 (5th Cir. 1976). Hence, the various facts alleged in the affidavit and accepted as true must be examined to see if they reflect "such pervasive bias and prejudice."

#### A. *November 7 Presentation*

■ The first substantial facts [1] stated in the affidavit involved the presentation of Mr. Atlee Wampler, then head of the Miami Organized Crime Strike Force, and Mr. Arthur Nehrbass, the agent in charge of the Miami FBI office, to the Court on November 7, 1979 in which it was disclosed to the Court that there might be a plot to disrupt the trial in *United States v. Meinster.*[2] Specifically, the defendant, citing relevant portions of the transcript, states:

1) "the trial court appeared ready to presume the worst" [3]

2) "the trial court, abandoning any efforts at maintaining a posture of impartiality, enthusiastically embraced the Government's 'investigation' of the alleged disruption scheme, actually advising the Government of the predicate it would have to lay for him to

---

**1.** Strictly speaking, the first fact stated in the affidavit is that the defendant pleaded guilty to one count and that in preparation for sentencing the Court reviewed her pre-sentence investigation prepared by the Probation department. Clearly, this fact is not a proper basis for recusal. *United States v. Clark,* 605 F.2d 939 (5th Cir. 1979).

**2.** This Court has elsewhere generally discussed the nature of this meeting which was steno-

graphically reported by a court reporter. *United States v. Meinster,* 488 F.Supp. 1342 (S.D. Fla.1980) (Order Denying Motion For New Trial Based On Newly Discovered Evidence).

**3.** The Court: . . . [W]hen you say 'disruption of the trial,' my mind conjures up something like somebody rolling a hand grenade into the courtroom. Is that what you're talking about?
Transcript at 36. *But see* Part A 1 *infra.*

allow the FBI informant to meet with Mr. Meinster and Mr. Platshorn." [4]

3) "the trial court . . . urged the use of a court ordered wire tap; [5]

Without any citation to anything in the transcript, the defendant states:

4) "the end result of this *in camera* proceeding was that the trial court agreed to cooperate with the Government by allowing the FBI informant to visit Mr. Platshorn and Mr. Meinster at the Federal Correctional Institution under a special court order knowingly issued to a man using an alias, knowing that the informant would have a body transmitter on his person to transmit and assist in the recording of any incriminating statements to be made by Mr. Platshorn, Mr. Meinster, or myself." [6]

As noted already, this Court must accept as true and accurate the transcript of the November 7 hearing, but need not accept the defendant's characterizations or interpretations of that transcript as stated above. Moreover, the Court notes that the context of that hearing was a unique one in which neither Mr. Wampler nor the Court (nor, for that matter, Chief Judge Atkins who had been approached by the head of the Strike Force) was certain about the law surrounding these circumstances.

Each of the defendant's conclusions will be treated in turn.

1. The cited portion of the transcript does not demonstrate that the Court was ready "to presume the worst" about the alleged plot. Rather, the Court was trying to ascertain the nature of the alleged disruption by posing a hypothetical question. Transcript at 35–36. The Court was properly concerned with the nature of the alleged disruption since its nature would obviously determine what ruling, if any, the Court would make on Mr. Wampler's motions. Throughout the hearing the Court dealt hypothetically with any number of possible ways a mistrial might be caused in the trial.[7] It is difficult to see how such hypothetical discussions and questions demonstrated pervasive bias or prejudice.

2. The portion of the transcript cited for the conclusion that the Court "embraced" the government's investigation and even advised the government of the legal "predicate it would have to lay" is similarly misinterpreted by the defendant. First, it is frivolous to argue that it is improper for the Court to advise the government of the burden it must meet to justify its motions. The Court's announced standard may be either correct or erroneous, but it need not withhold its decisional rationale from the party before it. Second, far from embracing the government's investigation, the cit-

**4.** The Court: . . . Actually, strayed a bit here. I was talking about the question of wire tapping with consent. That is, your confidential informant, I presume, would go in with a wire tap apparatus and tape record the conversation and then the FBI would know what plans, if any, these defendants have toward disrupting this trial? Now, my question, and what I am thinking about, is what would be the basis for this judge giving you permission to do that? The basis would be, would have to be, that I was convinced that there was at least a possibility of some serious harm to someone. You see, if I am convinced of that, then I have no difficulty agreeing . . .
Transcript at 41. *But see* Part A 2 *infra.*

**5.** The Court: What I meant by a *court ordered* wire tap was that of Mrs. Platshorn's phone. Because my concern is that, by worrying about a consensual wire tap you're not going to find out anything until, at least, Thursday, and Mrs. Platshorn may not be—she obviously, from what you have told me, is involved. And, with-

out assuming that Mr. Platshorn or Mr. Meinster are involved at all, without imputing to them any improper motives or bad knowledge or any knowledge at all, it might be appropriate to implement some wiretaps on any phones that Mrs. Platshorn is likely to use . . .
Transcript at 47. *But see* Part A 3 *infra.*

**6.** This issue was also raised in *United States v. Meinster,* 488 F.Supp. 1342 (S.D.Fla.1980) (Order Denying Motion For New Trial Based On Newly Discovered Evidence).

**7.** Mr. Nehrbass, the FBI agent present at the hearing, was less hypothetical:
Mr. Nehrbass: Our feeling is that the only way that the trial could be effectively obstructed is through the use of some sort of violence. . . . We feel that violence is definitely contemplated.
Transcript at 39–40.

ed portion of the transcript, in context, demonstrates the Court's uncertainty that it need rule on the government's motions at all:

> Actually, we strayed a bit here. I was talking about the question of wiretapping with consent. That is, your confidential informant, I presume, would go in with a wiretap apparatus and tape record the conversation and then the FBI would know what plans, if any, these defendants have toward disrupting this trial? Now, my question, and what I am thinking about, is what would be the basis for this Judge giving you permission to do that? The basis would be, would have to be, that I was convinced that there was at least a possibility of some serious physical harm to someone. You see, if I am convinced of that, then I have no difficulty with agreeing, if my permission is necessary, and I don't know that it is, but I guess it is, or you would not be talking to me—

Transcript at 41 (underlined portion not cited by the defendant). Surely, this does not demonstrate pervasive bias or prejudice on the part of the Court.

3. The defendant's conclusion that the Court urged the use of a court ordered wiretap similarly becomes less sinister when placed in context. The defendant correctly points out that the government's confidential informant was supposed to be the operative force behind the alleged conspiracy to disrupt the *Meinster* trial and, in that sense, the government appeared to be on top of the plot. Yet this Court could not ignore the representations of Mr. Nehrbass and Mr. Wampler.

> Mr. Nehrbass: If I might, they are probably also going to meet another LCN [La Cosa Nostra] member, by the name of Anthony Aceturo and two of his hoodlums. And Aceturo is known to us to have a very violent reputation.

> Mr. Wampler: That was under discussion. Ralph Stein who is from New Jersey, was discussing bringing Aceturo and his henchmen in for something, sort of muzzling in, to help down here.

> So, at that point, we began to feel that we might possibly, one, be unable to control the situation; and two, we do not know what other plans these people may have afoot, if any.

Transcript at 37–38. Given that the government's confidential informant might never learn of possible ancillary plots to disrupt the trial, it was not improper for the Court to raise the issue of a court ordered wiretap.[8] Had the Court insisted and forced the government to conduct such a wiretap, bias might have been evident. *Cf. Bell v. Chandler*, 569 F.2d 556 (10th Cir. 1978) (disqualification warranted in a highly unusual case based, in part, on the trial court's discovery order which extended well beyond the items requested by litigant). But such is not the case here.

In addition, the Court's statement that Mrs. Platshorn's telephone might appropriately be wiretapped similarly expresses the Court's concern about these possible ancillary plots. Finally, the Court's aside that "she obviously, from what you have told me, is involved" is a logical summation of the presentations of Mr. Wampler and Mr. Nehrbass[9] and does not demonstrate pervasive prejudice against the defendant.

4. The defendant's contention that the Court agreed to issue an order to facilitate the visit of the government's confidential informant is wholly unsupported by the transcript of the Court's November 7, 1979 hearing and the defendant has alleged no facts in support of such an allegation. Moreover, even if such a conclusion were accurate, it would be insufficient to demon-

---

8. Only after this suggestion by the Court did Mr. Wampler and Mr. Nehrbass make it clear that nothing in the alleged plot was to occur until substantial sums of money exchanged hands. Transcript at 49. This additional information obviated the need for a court ordered wiretap.

9. Just prior to the Court's statement, Mr. Wampler, for example, had stated: "We do know for sure that because of the recordings that we already have of Mrs. Platshorn's participation in it [i. e. the conspiracy]." Transcript at 47.

strate pervasive bias or prejudice. *See United States v. Meinster,* 488 F.Supp. 1342 (S.D.Fla.1980) (Order Denying Motion For New Trial Based On Newly Discovered Evidence). *Cf. Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

When the transcript of the November 7 hearing is reviewed in its entirety, its tenor becomes clear.[10] The Court was predominantly concerned with (1) the possibility that alleged plans to disrupt the trial might jeopardize the physical safety of the participants in the trial, and (2) that the jury in *Meinster* be insulated from any possible prejudicial pretrial publicity. Nowhere in the transcript is personal animosity nor pervasive bias towards Lynne Platshorn displayed.

**B.** *The Continuance of the Defendant's Sentencing*

After approximately a month of trial, the defendant pleaded guilty to a single count in the indictment on October 24, 1979. Her sentencing was thereafter scheduled for November 14, 1979. On November 13 the Court *sua sponte* continued the defendant's sentencing. Mrs. Platshorn contends that this continuance, after the government informant had apparently predicted a continuance, gives rise to the reasonable suspicion that the Court continued the sentencing to allow the informant "to demonstrate his ability to insert himself into and change the course of judicial proceedings, and, thus, give himself credibility." Again, the Court need not accept this conclusion if a reasonable person would not so conclude. Accepting the alleged facts that the government informant had predicted the continuance and later took credit for it, there is a much more reasonable explanation for the continuance.

As the defendant now knows, on November 7, 1979, this Court was informed that the defendant was an alleged participant in a supposed plot to disrupt the *Meinster* trial. This Court had no obligation to inform the defendant of the government's ongoing investigation. *See United States v. Meinster,* 488 F.Supp. 1342 (S.D.Fla. 1980) (Order Denying Motion For A New Trial Based On Newly Discovered Evidence). Nonetheless, this Court could not proceed to sentence the defendant on November 14, 1979, having knowledge which was unavailable to the defendant and therefore could not be challenged by her. Considering these facts, a reasonable person would conclude not that the *sua sponte* continuance was part of a plan to "set up" the defendant nor that it evinced pervasive bias by the Court, but rather that a continuance was the Court's own and only practical solution to a legal conundrum.

**C.** *Psychiatric Treatment of the Defendant*

Finally, the defendant asserts that the Court's restrictions on her psychiatric treatment evince its bias and prejudice. On the contrary, the record reflects that the Court has tried to accommodate reasonably Mrs. Platshorn and her medical problems. The start of the trial in this case was complicated by the defendant's health problems which the Court attempted to accommodate at that time. When the defendant pleaded guilty, she requested and obtained the Court's permission to travel to New York to visit her doctor there. It was this very trip which the government later alleged was crucial in the purported plot to disrupt the *Meinster* trial. Shortly after her indictment and arrest on the conspiracy to obstruct justice charge, the defendant requested permission to receive psychiatric

---

**10.** For example, the defendant does not note passages such as the Court's initial warning to the government that it was not necessarily disposed to granting any of the government motions. *Id.* at 32–33. Nor does the defendant cite statements such as the Court's caution:

The Court: . . . I was about to go one step further and suggest to you that what is on

my mind is the possibility of great harm, physical harm, to innocent court personnel, the jurors, court reporters, clerks, defense and prosecution lawyers, *that are not involved in this matter at all—not that there is a matter to be involved in, there may be or may not be.*

*Id.* at 42 (emphasis added).

treatment while in custody. The Court permitted the defendant to be treated but denied her request to be treated by her own psychiatrist. The defendant's psychiatrist was denied direct access to the defendant, but was informed that he could consult with the prison physicians on the most appropriate form of treatment.

The defendant's argument is strained. To be manageable from the Court's point of view, the treatment of an incarcerated patient is best coordinated by a single qualified physician. Given the circumstances of this case, it was altogether proper to have Mrs. Platshorn's treatment supervised by a competent prison physician while giving her personal physician the opportunity to consult with the treating physician. Limitations on direct contact with her personal psychiatrist were warranted both so that her treatment could be effectively administered and to obviate any possible danger of a continuation of an alleged conspiracy to disrupt the trial in *Meinster*. On this latter point, the defendant makes a rather inconsistent argument to the Court. In one portion of her affidavit the defendant argues that the Court should have "quashed any threat of disruption . . . by placing restrictions on the activities of Mr. Meinster and Mr. Platshorn (they were, after all, incarcerated)." Yet the Court had no evidence at that time that Mr. Meinster and Mr. Platshorn were involved in the conspiracy. On the other hand, the defendant argues that limitations on *her* contacts while incarcerated—after the Court had listened in open court on December 6, 1979 to tape recordings of her plans to disrupt the proceedings—were improper and somehow evince pervasive bias.

Following the December 15 order on psychiatric treatment, the Court acted promptly on the defendant's request for a psychiatric evaluation. Order of January 11, 1980. Moreover, when the defendant's personal psychiatrist recommended that the defendant be administered certain specific medi-

cations, a recommendation apparently growing out of telephone contacts explicitly prohibited by the Court,[11] the Court did not pause to chastise the doctor but promptly granted his recommendation. Order of January 28, 1980. Clearly, a reasonable person would not conclude that these actions of the Court demonstrate any personal bias against the defendant, let alone pervasive bias or prejudice.

\* \* \*

■ Where a litigant contends that acts done and the views expressed by a judge in his or her judicial role are the grounds for recusal, the litigant must demonstrate pervasive bias or prejudice. The defendant has failed to meet this test under a reasonable person standard. It goes without saying that if this Court believed it might have any personal bias towards Mrs. Platshorn it would recuse itself irrespective of the formal legal standard. Such, however, is also not the case.

Following the withdrawal of her guilty plea, the trial in this case promises to be difficult, lengthy, and repetitive of much of the *Meinster* case. The Court does not relish presiding over it. Yet, when Congress amended Section 455 eliminating the "duty to sit" concept, it noted:

> While the proposed legislation would remove the 'duty to sit' concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.
>
> At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legis-

---

11. *Compare* Order of December 15, 1979 at 1–2: "the circumstances seem inappropriate for allowing Dr. Weiss to visit Lynne Platshorn in jail, or to speak with her at anytime" *with*

Letter from Dr. Weiss to Mr. Kessler, defendant's counsel, January 21, 1980: "I have received several phone calls from Mrs. Platshorn over the past few weeks . . . .".

lation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.Rep.No.93–1453 as reprinted in 1974 U.S. Code Cong. & Admin.News, pp. 6351, 6355.

For the above reasons, it is hereby

ORDERED and ADJUDGED that the defendant's motion to recuse is denied.